STATE OF NORTH CAROLINA v. SUSAN M. RICHARDS

No. 55

(Filed 17 April 1978)

1. **Criminal Law § 69— telephone conversations—establishing identity of caller**

    Before a witness may relate what he heard during a telephone conversation with another person, the identity of the person with whom the witness was speaking must be established. However, it is not always necessary to prove the identity of the caller before introducing evidence of the conversation, particularly in criminal prosecutions where secrecy, anonymity and concealed identity are generally resorted to, but it is only necessary that identity of the person be shown directly or by circumstances somewhere in the development of the case.

2. **Criminal Law § 69— telephone conversations—identity of caller—circumstantial evidence**

    In this prosecution for murder and conspiracy to commit murder, there was sufficient circumstantial evidence to identify a telephone caller as "Bob Stem" so as to permit the victim's wife to testify as to telephone conversations with the caller concerning a business trip the victim was taking and a note co-signed by the victim and Bob Stem where the evidence showed that the telephone numbers at the home of the victim and his wife were unlisted; the victim's wife had taken telephone calls numerous times over a period of six months from a caller who always identified himself as Bob Stem and who asked to speak to the victim; she would then hear the victim talking with the caller concerning business dealings; she recognized the voice of the caller on the occasion in question as being the same voice which had called the home several times a week for six months; and defendant told an accomplice that Bob Stem had instigated the killing and had provided information by which the accomplice and defendant located the victim while he was on a business trip.

3. **Conspiracy § 5.1— failure to try third person for conspiracy—evidence of third person's involvement**

    In a prosecution for murder and conspiracy with a second person to commit murder, the State's election not to try a conspiracy indictment naming a third person and defendant as conspirators did not bind the State to refrain from offering evidence of the third person's involvement in order to convict defendant, and defendant was not unfairly surprised by testimony showing the third person's involvement in the crimes charged against defendant.

4. **Homicide § 17— business dealings between victim and another—motive for killing**

    In this prosecution for murder and conspiracy to commit murder, testimony by the victim's wife regarding business dealings between her husband and another person was relevant to support the State's theory that such other person had a financial motive for wanting to murder the victim and hired defendant to kill the victim.

State v. Richards

### 5. Searches and Seizures § 7— seizure of pistol—incident to lawful arrest

A pistol which an arresting officer observed in a bedroom to which defendant had gone to obtain clothing and personal effects was properly seized incident to defendant's lawful arrest to insure the safety of the arresting officers and to prevent the escape of defendant.

### 6. Searches and Seizures § 24— probable cause for warrant

Probable cause existed for the issuance of a warrant to search an apartment occupied by defendant and her accomplice for a .25 caliber pistol used in a murder where the affidavit to obtain the warrant contained facts from which the issuing magistrate could find probable cause to believe that the pistol might be concealed in the apartment and that the informant through whom some of the information was acquired was reliable.

### 7. Searches and Seizures § 40— seizure of items not named in warrant

Where a lawful search pursuant to a search warrant is being conducted, items uncovered during the course of this search may be seized if the items would have been seizable under previously announced rationales for warrantless, plain view seizures (i.e., the items were "the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime," or were items for which probable cause existed to believe that they were evidence of criminal activity and would aid in a particular apprehension or conviction), and the items were discovered inadvertently, that is, there was no intent on the part of investigators to search for and seize the contested items not named in the warrant.

### 8. Searches and Seizures § 40— seizure of items not named in warrant—nexus between items and crime—inadvertent discovery

Although a .38 caliber pistol and a .22 caliber sawed-off rifle were not named in a warrant to search an apartment occupied by defendant and her accomplice for a .25 caliber pistol used in a murder, an appropriate nexus between the .38 caliber pistol and rifle and criminal activity was established, and those items were inadvertently and properly seized during a search pursuant to the warrant, where information possessed by the officers at the time of the search that the accomplice was a hired killer and that he and defendant had been seen prior to the killing with several small handguns gave the officers probable cause to believe that the seized guns might be connected with and used as evidence in the killing under investigation, and where the evidence on voir dire supported the conclusion that the officers did not enter the apartment intending to search for or seize anything other than a .25 caliber pistol which they believed to be the murder weapon.

### 9. Searches and Seizures § 22— probable cause for warrant—failure to show oral testimony was sworn—Georgia law

Where probable cause for issuance of a search warrant was clearly supplied by an officer's affidavit, there was no error under Georgia law in the State's failure to show that additional information presented orally by the affiant was in the form of sworn testimony.

**10. Searches and Seizures § 39— seizure of guns in Georgia—crime in North Carolina—Georgia law**

Georgia's law did not prohibit the seizure of guns in that state pursuant to a search warrant because the crime under investigation was committed in North Carolina.

**11. Constitutional Law § 48— right to effective assistance of counsel**

The right to the assistance of counsel secured by the Sixth Amendment to the Federal Constitution, as applied to the states through the Fourteenth Amendment, and by the North Carolina Constitution, Article I, §§ 19 and 23, guarantees the effective assistance of counsel.

**12. Constitutional Law § 48— effective assistance of counsel—physical incapacity —specific acts or omissions**

The question of whether a defendant has been denied the effective assistance of counsel because of the physical incapacity of counsel does not turn on the physical incapacity as such, since this may or may not deprive a defendant of effective representation. Rather, it is necessary to examine counsel's specific acts or omissions which the defendant alleges constitute a denial of effective assistance.

**13. Constitutional Law § 48— effective assistance of counsel—loss of hearing—failure to object to letter**

In this prosecution for murder and conspiracy to murder, defendant was not denied the effective assistance of counsel on the ground that defense counsel lost ninety percent of the hearing in his left ear during the course of the trial and was unable to object to testimony by an accomplice's former wife as to the contents of a letter she had written concerning the murder where defense counsel's cross-examination of the witness indicated that counsel was well aware of the contents of the letter; a portion of the letter supported defendant's contention that the accomplice committed the murder without her knowledge or assistance; the letter, for the most part, was admissible as a prior consistent statement; any technically inadmissible portions of the letter were inconsequential; and whether counsel should have objected to the letter was largely a question of trial tactics.

**14. Constitutional Law § 48— effective assistance of counsel—loss of hearing— cross-examination of witnesses—presentation of evidence**

There is no merit in defendant's contention that she was denied the effective assistance of counsel on the ground that defense counsel lost ninety percent of the hearing in his left ear during the course of the trial and was thus unable to cross-examine properly some of the State's witnesses and to present defendant's evidence effectively.

DEFENDANT appeals from judgment of *Rousseau, J.,* at the 22 November 1976 Criminal Session of GUILFORD County Superior Court. This case was argued as No. 18, Fall Term 1977.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Assistant Attorney General, for the State.*

*Percy L. Wall and Robert S. Cahoon, Attorneys for defendant appellant.*

EXUM, Justice.

Upon separate bills of indictment defendant was tried and convicted of first degree murder of one John Charles Conaghan (76-CR-20163) and conspiracy with one James Wertheimer to commit this murder (76-CR-20298). She was sentenced, respectively, to life and ten years imprisonment, the ten-year sentence to run concurrently with the life sentence. Defendant's motion to bypass the Court of Appeals on the conspiracy conviction was allowed 3 May 1977.

Defendant's assignments of error are based on her contentions that (1) the trial court erred in admitting certain testimony by the widow of the deceased, on grounds of insufficient identification of a telephone caller, unfair surprise, hearsay and relevancy; (2) the trial court erroneously admitted into evidence certain weapons which were unlawfully seized; and (3) she was denied effective assistance of counsel at trial. After carefully examining each of these contentions, we find no error in the trial.

Although this murder occurred in Greensboro, North Carolina, the victim, defendant, and the state's principal witness, James Wertheimer, who according to his testimony was defendant's accomplice, were all residents of Georgia. Wertheimer testified, in essence, that during the summer of 1975 in Atlanta defendant prevailed upon him to help her murder Jack Conaghan. Defendant told Wertheimer that a friend of hers wanted Conaghan killed and would pay $2500 to have it done because Conaghan was a "con artist that had . . . ripped the [friend] off . . . for quite a bit of money." Wertheimer and defendant made elaborate plans for the murder which defendant's "friend" wanted accomplished somewhere other than Atlanta. Through information supplied by defendant, which she said came from "Bob," Wertheimer learned that Conaghan would be at the Hilton Inn, Greensboro, around 23 October attending a furniture market. During the preparations in Atlanta for the killing Wertheimer testified that the person he understood to have proposed the kill-

ing called the apartment where he and defendant lived and identified himself, when Wertheimer answered, as "Bob Glick." On 22 October 1975 Wertheimer and defendant traveled from Atlanta to Greensboro in two cars—she in her Pinto and he in a 1961 Cadillac which he had purchased cheaply and which they planned to discard after the killing. They located Conaghan's room at the Hilton Inn in Greensboro. Shortly after midnight they both entered the room, robbed Conaghan of $40, and defendant killed Conaghan by shooting him in the back of the head four times at close range with a .25 caliber pistol. After Wertheimer and defendant returned to Atlanta on the morning of 23 October, they read newspaper accounts of the murder. Defendant then stated her intention to collect the money. She gave Wertheimer for the first time the name, address and telephone number of Bob Stem as being her friend who instigated the killing, saying she was afraid Stem would try to "double cross" her. Several days later by prearrangement Wertheimer followed defendant to the Cumberland Mall in Atlanta, where he observed her engage in a transaction with a balding man who appeared to be 40 or 45 years old. Wertheimer and defendant returned separately to the apartment where both were then living. Wertheimer arrived first. Ten or fifteen minutes later defendant returned with $2300 in cash remarking that she would get the balance due her in a few days.

Defendant testified as follows: She accompanied Wertheimer to Greensboro on 22 October because he had told her he needed to deliver a car and collect some money. When they stopped at a restaurant Wertheimer made a telephone call and on returning told her he had contacted the man he wanted to see. She followed him to a Zayre parking lot where he told her to wait and that he would be back in about an hour. She waited about two hours until he returned at approximately 2:00 a.m. They left the Cadillac in the parking lot where, Wertheimer explained, someone would pick it up. They drove back to Atlanta. Defendant admitted knowing Bob Stem. She had once been employed by him and had attended some "concept therapy" meetings conducted by him and his wife in their home. Defendant denied talking with Bob Stem about killing anybody, hearing the name Jack Conaghan prior to her arrest, being in the Greensboro Hilton, and ever shooting anyone.

State v. Richards

## I

Other evidence for the state tended to identify defendant's friend, the instigator of the crime, as Bob Stem. The testimony of Mrs. Peggy Conaghan, widow of the deceased, tended to establish the identity of Bob Stem, his relationship to Conaghan, and his reasons, or motive, for hiring defendant to kill Conaghan. The admission of this evidence forms the basis of several assignments of error, none of which are meritorious.

Mrs. Conaghan, over defendant's strenuous and continuing objections, was permitted to testify that a person who identified himself as "Bob Stem" telephoned the Conaghan apartment on a Sunday, 19 October, the day before her husband departed for Greensboro. She answered the phone, and the caller asked to speak to "Jack." She overheard her husband tell the caller that he was getting ready to go out of town, would be gone for a week and a half to two weeks, would be staying at the Hilton Inn in Greensboro, and would be driving a light blue Chevrolet. Her husband also told him what time he would be leaving Atlanta and approximately what time he would arrive at the Hilton. She further testified that around 6:00 p.m. on Monday, 20 October, the same person called again and asked if Jack were there. She replied that her husband had left that morning and should be in Greensboro. The caller asked her again concerning the type of car her husband had driven, and she told him the blue Chevrolet.

On cross-examination of Mrs. Conaghan the defendant brought out that a business, Jadon Industries, in which her husband was a principal, was a plaintiff seeking damages of $1,400,000 in a lawsuit pending in Charlotte, North Carolina. Her husband was going to stop off in Charlotte on his way to Greensboro to confer with attorneys about this case, and he mentioned this intention to Bob Stem in their telephone conversation on 19 October. She had heard her husband discuss this lawsuit with Bob Stem over the telephone on many prior occasions.

On redirect examination, again over defendant's strenuous objections, Mrs. Conaghan testified that on other occasions she and Bob Stem had discussed over the telephone a $150,000 note payable to the Trust Company Bank and co-signed by her husband and Bob Stem. She said this note was secured only by a

credit life insurance policy for the full amount of the note on the life of her husband.

Defendant objected to Mrs. Conaghan's testimony on direct and redirect on the grounds (1) that the caller was insufficiently identified; (2) defendant was unfairly surprised by evidence tending to show that she and Bob Stem had conspired together; (3) testimony regarding what her husband had told Bob Stem over the telephone was inadmissible hearsay; and (4) the testimony regarding the business dealings between Conaghan and Stem was irrelevant.

[1] "Before a witness may relate what he heard during a telephone conversation with another person, the identity of the person with whom the witness was speaking must be established." *State v. Williams*, 288 N.C. 680, 698, 220 S.E. 2d 558, 571 (1975). "If the call was *from* the person whose identity is in question, the mere fact that he represented himself to be a certain person is not enough" to identify him as that person, 1 Stansbury's N.C. Evidence § 96, p. 310 (Brandis Rev. 1973) (hereinafter "Stansbury"); *accord, State v. Williams, supra.* "Identity of the caller may be established by testimony that the witness recognized the caller's voice, or by circumstantial evidence." *State v. Williams, supra*, 288 N.C. at 698, 220 S.E. 2d at 571. It is not always necessary to prove the identification before introducing evidence of the conversation, particularly in criminal prosecutions where secrecy, anonymity and concealed identity are generally resorted to. In such cases it is "only necessary that identity of the person be shown directly or by circumstances somewhere in the development of the case . . . ." *State v. Strickland*, 229 N.C. 201, 208, 49 S.E. 2d 469, 474 (1948).

[2] In light of these principles there was here sufficient circumstantial evidence to identify Mrs. Conaghan's caller as Bob Stem, notwithstanding the fact that she had never personally met Bob Stem. Most of these circumstances are revealed in the testimony of Mrs. Conaghan. She related that the telephone numbers at the Conaghan residence were unlisted. She had taken telephone calls numerous times over a period of six months from a caller who always identified himself as Bob Stem and who asked to speak to her husband. She then would overhear her husband talking to the caller concerning business dealings. She herself had

talked to the caller concerning business dealings between him and her husband. She recognized the voice of the caller on the day before her husband left for Greensboro and the day of his leaving as being the same voice which had called the home several times a week for a period of six months. Defendant herself in cross-examining Mrs. Conaghan brought out the fact that Bob Stem was interested in the Charlotte lawsuit and had discussed it many times on the telephone with Mr. Conaghan. We find this evidence, the substance of the conversations on October 19 and 20, and the testimony of Wertheimer that defendant told him her friend "Bob Stem" had instigated the killing and had provided her with information by which Wertheimer and defendant located the whereabouts of Conaghan in Greensboro clearly sufficient to identify the caller to Mrs. Conaghan as this same Bob Stem. Similar circumstances were present in *State v. Williams, supra,* 288 N.C. 680, 220 S.E. 2d 558 (1975), where we held that the evidence was sufficient to identify the caller.

[3] Neither are we persuaded by defendant's contention that she was unfairly surprised by the testimony of Mrs. Conaghan tending to show a conspiracy between her and Bob Stem. Defendant's argument is this: Bob Stem was charged with conspiring with defendant to murder Jack Conaghan in another indictment which was listed on the trial calendar with the two cases now being considered. Stem was present in the courtroom on opening day of the session. The state elected not to call this indictment for trial. Defendant argues in her brief as follows:

> "The State elected to try defendant on the indictment charging the conspiracy with Wertheimer and declined to call for trial the conspiracy charge involving defendant and Stem. Having done so, it is argued, the State put defendant on notice that the conspiracy being tried involved only defendant and Wertheimer and not Stem. For all practical purposes, this constituted a bill of particulars and was notice to defendant that the State was not intending to pursue the defendant and Stem conspiracy. Defendant was led to believe through the actions of the District Attorney that only two conspirators were involved — not three."

Defendant on oral argument informed the court that, when the state elected not to call the Stem conspiracy indictment for trial,

Stem was excused from the courtroom and presumably returned to Atlanta. Had defendant realized, she argues, that the state was going to pursue the Stem conspiracy at defendant's trial, defendant would have subpoenaed Stem and used him as a witness.

The state's election not to try the conspiracy indictment naming Stem and defendant as conspirators was merely an election by the state not to put Stem on trial at that time. Absent from further express understanding between the state and defendant regarding the nature of the evidence the state intended to produce, we fail to see how the state's election would indicate to defendant that *evidence* of Stem's involvement would not be adduced at defendant's trial. An election not to pursue Stem for his alleged conspiracy does not bind the state to refrain from offering evidence of the conspiracy in order to convict defendant. As defendant argues elsewhere in her brief, the theory of the state's case against her was that Bob Stem had financial reasons for wanting to murder Jack Conaghan. He employed defendant to commit the crime, and she in turn enlisted the aid of Wertheimer. Furthermore, the record shows that in March, 1976, counsel for defendant was furnished with a copy of a statement Wertheimer gave to law enforcement officers in Georgia during December, 1975. This statement substantially coincided with Wertheimer's testimony at trial. Wertheimer's testimony constitutes evidence of a conspiracy between Stem and defendant. Mrs. Conaghan's testimony is simply more of the same kind of evidence. Defendant's brief also informs us that Bob Stem had been tried at the 17 January 1977 Session of Guilford Superior Court on "substantially the same evidence" presented in the trial of defendant. Stem, however, testified at that trial and denied his involvement in the killing. The jury acquitted him. The point is that all of the indictments returned against Wertheimer, Stem, and defendant arise out of substantially the same set of facts. There is, consequently, no basis for defendant to argue that she was unfairly surprised by testimony showing Bob Stem's involvement in these crimes charged against her.

[4]  Defendant's argument that Mrs. Conaghan's testimony regarding the business dealings between her husband and Stem was irrelevant is patently without merit. Defendant argues that this evidence, although irrelevant, was "high prejudicial" to her. It was of course highly prejudicial for the same reason that it was

relevant. It tended to prove the state's theory of this bizarre kill-
ing. It showed Stem's motive for hiring defendant to do the job.
Whether in fact Stem hired defendant was an important factual
issue in the case. Any circumstance bearing on that issue was
therefore relevant. Although the state had made out a case of
first degree murder with Wertheimer's testimony about what he
and defendant did in Conaghan's hotel room, it was not limited to
offering the evidence legally required for conviction. It is not re-
quired, for example, that the state show motive for a killing, but
evidence of motive, if otherwise admissible, "is not only compe-
tent, but often very important, in strengthening the evidence for
the prosecution . . . ." *State v. Casey*, 201 N.C. 185, 203, 159 S.E.
337, 346 (1931); *accord, State v. Vestal*, 278 N.C. 561, 592, 180 S.E.
2d 755, 775 (1971). Here evidence tending to show Stem's motive
for wanting Conaghan killed tended to strengthen the state's con-
tention that Stem hired defendant to do the killing. It thereby
strengthened the case against defendant herself.

## II

Defendant assigns as error the admission into evidence
against her of three firearms, a .38 caliber INA revolver (Exhibit
77), a .38 caliber Smith and Wesson revolver (Exhibit 79), and a
.22 caliber Mossberg sawed-off rifle (Exhibit 81). The context in
which these weapons were offered was this: During the presenta-
tion of its case in chief the state offered testimony that defendant
possessed a .38 caliber Smith and Wesson pistol in addition to a
.25 caliber automatic pistol which Wertheimer had purchased for
her at her request; that Wertheimer and defendant had test fired
a gun in Wertheimer's garage shortly before the murder; that
Wertheimer and defendant had between them four guns during
the period of time immediately prior to the murder; and that dur-
ing this time Wertheimer had made two silencers, one for a pistol
and the other for a rifle with a sawed-off barrel. Wertheimer
testified in addition that when he went to defendant's apartment
in September, 1975, she claimed two unidentified men had
entered her apartment and beaten her. Wertheimer then ob-
served defendant "sitting in the apartment at the dining room
table with her pistol, a .38 short, Smith and Wesson
chromeplated." Wertheimer also testified that, at the time of the
shooting of Conaghan, defendant possessed "her" .38 caliber pistol

which she handed to Wertheimer just before she shot Conaghan with the .25 caliber automatic pistol.

The state sought to offer Exhibits 77, 79 and 81 during its case in chief. Upon objection, a voir dire was conducted. During the course of the voir dire defendant withdrew her objection to Exhibit 77 and the state withdrew its tender of Exhibits 79 and 81. Exhibit 77 was then offered without objection.

On her direct examination defendant several times denied owning or possessing a firearm. She specifically denied having had a firearm on the occasion of the beating in September, 1975. Thereafter on cross-examination defendant denied having had a .38 caliber pistol in her apartment at 1650 Austell Road in December, 1975, after the shooting.

In rebuttal the state again tendered Exhibits 79 and 81. Defendant objected and, with the tender of these exhibits, was permitted by the court to lodge an objection against the introduction of Exhibit 77. Based on the voir dire which had been earlier conducted, the trial judge made findings of fact and concluded that all of the exhibits were properly admissible.

All of these weapons were found by investigating officers in December, 1975, at 1650 Austell Road, Apartment M-8, Marietta, Georgia, where both Wertheimer and defendant then lived together. Exhibit 77 was seized on 1 December 1975 at the time of defendant's arrest. Exhibits 79 and 81 were seized on 2 December 1975 during the course of a search of the apartment by investigating officers conducted pursuant to a search warrant authorizing the search for and seizure of a .25 caliber pistol thought to be the murder weapon.

Defendant complains of the introduction into evidence of all of these weapons on the ground that they were unlawfully seized. We conclude that all of the weapons were lawfully seized and overrule this assignment of error.

[5] We first consider the admission into evidence of Exhibit 77 seized at the time of defendant's arrest on 1 December 1975. On voir dire the state introduced evidence tending to show that late in the evening on 1 December officers from Greensboro and the Atlanta area went with an arrest warrant to the apartment on Austell Road in Marietta, Georgia, where Wertheimer and defend-

ant were living together. Wertheimer came outside and was arrested as he reached in his pocket for a .38 caliber Derringer, which was also seized at that time. The officers then entered the apartment and placed defendant under arrest. At her request she was permitted to go to her bedroom to get clothing and personal effects. Detective Allen Travis accompanied her. The officers had information that Wertheimer and defendant had entered into a "suicide pact" to the effect that "they would not be taken alive if police had an opportunity to corner them in an attempt to make an arrest." When Travis followed defendant to her bedroom he observed in the open top drawer of a dresser a .38 caliber pistol (Exhibit 77) which he then seized and found to be loaded with five hollow-point bullets. Defendant offered no evidence on voir dire. The trial court found the facts in accordance with the state's evidence and concluded that the pistol was properly seized incident to defendant's lawful arrest. We agree.

Clearly the seizure of this weapon to insure the safety of the arresting officers and to prevent the escape of defendant was reasonable. In order to justify the seizure of a weapon as being incident to a lawful arrest it is not necessary that the weapon be on the person being arrested. We sustained similar seizures of weapons under similar circumstances in *State v. Alford,* 289 N.C. 372, 222 S.E. 2d 222 (1976), *death penalty vacated in companion case,* 429 U.S. 809 (1976), and *State v. Curry,* 288 N.C. 660, 220 S.E. 2d 545 (1975). In *Alford* we noted, 289 N.C. at 381, 222 S.E. 2d at 228, "At that time [when officers had burst into an apartment for the purpose of arresting defendants] the 9 millimeter pistol was in plain view on a dresser. The seizure by the police of the pistol, which was in plain view during their search for Carter who, under the existing conditions, was aware of their presence and could use such weapon to make good his escape, was entirely justified." The United States Supreme Court in *Chimel v. California,* 395 U.S. 752, 763 (1969) indicated that weapons may be seized incident to a lawful arrest if they are in areas where

"an arrestee might reach in order to grab a weapon or evidentiary items . . . . A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate

control' — construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

See also *Giacalone v. Lucas*, 445 F. 2d 1238 (6th Cir. 1971). It is not clear from the record precisely how far defendant was from the dresser at the time the officer seized the pistol. Justification for such a seizure as this, however, does not depend on showing with mathematical precision that defendant could have reached the weapon moments before the seizure. The seizure in this case was well within the rationale permitting seizures incident to a lawful arrest for the protection of the arresting officers and to prevent the escape of the arrestee. The area, being in the same bedroom with defendant, was one "from within which" defendant might have gained possession of the weapon.

We now take up the admission into evidence of State's Exhibits 79 and 81, both seized during the execution of a search warrant. Defendant argues that these weapons were erroneously admitted because there was no probable cause for the issuance of the warrant and the weapons seized were not described in the warrant.

[6] There is no merit to defendant's contention that probable cause was lacking for the issuance of this warrant. The warrant was obtained from a Georgia judicial officer upon the affidavit and oral testimony of Michael Whaley, an investigator in the office of the Fulton County District Attorney. The affidavit recited affiant's belief that Wertheimer and defendant had on their premises at 1650 Austell Road, Apartment M-8, Marietta, Georgia, a certain .25 caliber automatic pistol and that this pistol constituted evidence in the case of the Conaghan murder in Greensboro. The affidavit then recited the facts upon which this belief was based as follows: Conaghan was killed on 23 October 1975 with a .25 caliber automatic pistol in a Greensboro motel. A reliable informant had stated to Whaley that Wertheimer killed Conaghan. A search of Wertheimer's former residence at 2612 Dogwood Terrace, Atlanta, by the affiant resulted in the seizure of certain .25 caliber bullets of the type used in Conaghan's murder. The informant told Whaley further that Wertheimer kept weapons at a place where he was living prior to the killing. A search of this residence failed to reveal the presence of weapons,

and all of Wertheimer's property and effects had been removed from that address. Affiant himself, through surveillance, had established Wertheimer's present address at 1650 Austell Road, Apartment M-8, Marietta, Georgia. Wertheimer had been arrested for the murder of Conaghan, and the arrest warrant was attached to and made a part of the affidavit by reference. The informant was believed to be reliable because information earlier given by the informant had been verified. The details of this verified information were set out in the affidavit. This affidavit alone contained facts from which a magistrate could find probable cause to believe that a weapon used in the murder of Conaghan, to wit, a .25 caliber automatic pistol, might be concealed at the named apartment on Austell Road. Furthermore, the affidavit contained facts sufficient for the magistrate to adjudge that the informant through whom some of the information was acquired was reliable. We conclude therefore that the warrant was lawfully issued. *United States v. Harris*, 403 U.S. 573 (1971); *United States v. Ventresca*, 380 U.S. 102 (1965); *Aguilar v. Texas*, 378 U.S. 108 (1964); *State v. Spencer*, 281 N.C. 121, 187 S.E. 2d 779 (1972); *State v. Spillars*, 280 N.C. 341, 185 S.E. 2d 881 (1972); *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971); G.S. 15A-244.

With regard to defendant's contention that Exhibits 79 and 81 were not named in the warrant and were therefore unlawfully seized, we start, of course, with the Fourth Amendment to the United States Constitution, which prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In *Marron v. United States*, 275 U.S. 192, 196 (1927) the Supreme Court said:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."

Nevertheless the search for and seizure of items not named in the warrant were upheld in that case as incident to a lawful arrest.

The strict rule stated in *Marron* has been substantially eroded if not abrogated altogether by later cases of the United States Supreme Court. In *Harris v. United States*, 390 U.S. 234 (1968), the Court sustained the seizure of an automobile registration card used in evidence against the defendant at his trial. The card was found by a police officer who, after the car had been impounded, was engaged in securing the vehicle by rolling up the windows and locking the doors. When he opened one door for this purpose he saw the registration card laying face up on the metal stripping over which the door closed. The Court said, 390 U.S. at 236:

> "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."

This doctrine has been used a number of times by this Court in sustaining the seizure of items in plain view during the execution of a search warrant when those items were not named in the warrant. *State v. Riddick*, 291 N.C. 399, 230 S.E. 2d 506 (1976); *State v. Rigsbee*, 285 N.C. 708, 208 S.E. 2d 656 (1974); *State v. Newsom*, 284 N.C. 412, 200 S.E. 2d 617 (1973).

There is no showing in this record that Exhibits 79 and 81 were in "plain view" at the time they were seized in the sense, at least, that no "search" was necessary to uncover their existence. The only evidence on this point is that one detective testified that he found Exhibit 79 in a dresser drawer with "ladies clothing, slips, panties, bras, and things of this nature." Neither the location nor the circumstances surrounding the seizure of Exhibit 81 appear in the record. This is not, however, fatal to our conclusion that these items were lawfully seized.

In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the majority opinion engaged in a wide-ranging discussion of the law of search and seizure. This opinion stated, 403 U.S. at 465:

> "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the cir-

cumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.

"An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character."

The Court said further, 403 U.S. at 467-68:

"Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous — to the evidence or to the police themselves — to require them to ignore it until they have obtained a warrant particularly describing it."

[7] We interpret *Coolidge* and the cases upon which it relies to mean that, where a lawful search pursuant to a search warrant is being conducted, items uncovered during the course of this search may be seized if the items would have been seizable under previously announced rationales for warrantless, plain view seizures (*i.e.*, the items were "the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime," *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 295 (1967), and cases there cited at n. 1; or were items for which probable cause existed to believe that they were evidence of criminal activity and would "aid in a particular apprehension or conviction," *id.*, at 307) and the items are discovered "inadvertently." These previously announced rationales for warrantless, plain view seizures have sometimes been referred to as a requirement that there be a "nexus between the items seized and criminal behavior." *State v. Newsom, supra*, 284 N.C. 412, 200 S.E. 2d 617 (1973). The meaning of the inadvertence requirement, first alluded to in *Coolidge*, is not entirely clear. *State v. Rigsbee*, 285 N.C. 708, 208 S.E. 2d 656 (1974) and authorities cited therein. We interpret it to mean that there must be no intent on the part of investigators to search for and seize the contested items not named

in the warrant. In discussing this requirement in *Coolidge* the Court said, 403 U.S. at 470-71:

"But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'Per se unreasonable' in the absence of 'exigent circumstances.'

"If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of 'Warrants . . . particularly describing . . . [the] things to be seized.'"

This is the interpretation we applied in *State v. Rigsbee, supra;* see also *State v. Zimmerman,* 23 N.C. App. 396, 209 S.E. 2d 350 (1974).

[8] We conclude that the record in this case establishes an appropriate nexus between Exhibits 79 and 81 and criminal activity and that these items were inadvertently seized.

After hearing evidence on voir dire, the trial court found as facts that the investigating officers had information that Wertheimer was in the possession of certain weapons; that Officer Michael Whaley had previously searched the prior residence of Wertheimer for a .25 caliber pistol, which he did not find there; that the search warrant specified a .25 caliber pistol; and that in the course of executing the search for this pistol pursuant to the warrant the officers seized Exhibits 79 and 81. The trial court concluded that the officers were entitled to seize these two weapons. There is ample evidence in the record to support the trial judge's findings that the search of the apartment was for the .25 caliber pistol and not for Exhibits 79 and 81. Findings of fact made by the trial judge and conclusions drawn therefrom are binding on appellate courts if supported by evidence in the record. *State v. Rigsbee, supra,* 285 N.C. 708, 208 S.E. 2d 656 (1974).

The fact that Exhibits 79 and 81 are deadly weapons goes a long way toward satisfying the nexus between these items and criminal activity. This, taken together with the fact that the officers had information at the time of the search that Wertheimer, one of the defendants, was a hired killer and had been seen prior to the killing with several small handguns, and the fact that a .38 caliber Derringer was taken from his person at the time of his arrest the day before the search, is enough, we believe, to give the searching officers probable cause to believe that Exhibits 79 and 81 might be connected with and used as evidence in the crime under investigation.

The officers were engaged in a search for what they believed was the murder weapon itself. They had information that Conaghan had been shot with a .25 caliber weapon. They had found .25 caliber bullets and casings in Wertheimer's former residence in Atlanta. They asked particularly for a search warrant specifying a .25 caliber pistol. While they were aware of the possibility, generally, of the existence of other weapons which had been observed to be at one time or another in the possession of Wertheimer and the defendant, they did not have a description of these weapons nor did they have information as to their probable location. Their testimony on voir dire together with the information provided in the affidavit used to obtain the warrant consequently supports the conclusion that they did not enter the premises at 1650 Austell Road intending to search for or seize anything other than what they believed to be the murder weapon itself. The discovery and seizure of Exhibits 79 and 81, therefore, was inadvertent. *State v. Rigsbee, supra,* 285 N.C. 708, 208 S.E. 2d 656 (1974).

Our holding here, contrary to what was concluded on similar facts by the New York Court of Appeals in *People v. Baker,* 23 N.Y. 2d 307, 244 N.E. 2d 232 (1968), decided before *Coolidge,* does not transform the warrant which authorized the search into a general warrant—a device, as noted in *Baker* at 320-21, 244 N.E. 2d at 238, "abhorred since colonial days and banned by both the Federal and State Constitutions." Such warrants are banned, too, by the North Carolina Constitution, Art. I, § 20. The general warrant against which these constitutional provisions speak did not specify items to be searched for or persons to be arrested nor were they supported by showings of probable cause that any par-

ticular crime had been committed. *See generally, Stanford v. Texas*, 379 U.S. 476 (1965); *Marcus v. Search Warrants*, 367 U.S. 717 (1961); *Brewer v. Wynne*, 163 N.C. 319, 79 S.E. 629 (1913).

The search warrant issued in this case, as we have already demonstrated, was not such a warrant. The fact that evidence not specified in the warrant was discovered inadvertently during its execution does not make it so. The searching officers were duly authorized to enter the apartment and make the search. We do not have here the situation where the item named in the warrant was found and a search then continued for other items. Seizure of the other items under such circumstances probably could not withstand the rationale of *Coolidge*. The searching officers in this case never found the .25 caliber pistol which was the object of the search and which was particularly described in the warrant. They did, however, find State's Exhibits 79 and 81 during the course of this search for the .25 caliber pistol.

For a pre-*Coolidge* case which reaches the same conclusion as ours under quite similar facts, see *United States v. Alloway*, 397 F. 2d 105 (6th Cir. 1968).

Defendant relies also on Georgia law in challenging the legality of the seizure of these weapons. She argues the law of that state "is controlling since the arrest, issuance of the search warrant and seizure of the weapons took place there." Defendant's argument at this point seems to encompass two distinct propositions. The first is that in interpreting the United States Constitution the Georgia cases have set a higher standard for official conduct than have the North Carolina or federal cases. In this regard, however, we are not bound by the decisions of the Georgia courts. *State v. Myers*, 266 N.C. 581, 146 S.E. 2d 674 (1966). The second proposition is that, even if the Federal Constitution does not require their exclusion, these weapons were seized in violation of Georgia Code § 27-303 and cases decided thereunder, and thus it was error to admit them against defendant at her trial in this state. We assume, without deciding, that such a violation of Georgia law would have the effect urged by defendant. Nevertheless, we have examined the Georgia statute and cases cited by defendant and found nothing that would render the seizure of these weapons illegal thereunder.

It should be noted that with reference to searches and seizures the Georgia criminal procedure statutes, like comparable provisions of Chapter 15A of the North Carolina General Statutes, *see particularly* G.S. 15A-242 and 15A-253, appear to be codifications of federal constitutional requirements.

[9] Defendant's first contention based on Georgia law is that the state, having the burden of showing probable cause at the time the warrant was issued, *Sheppard v. State*, 138 Ga. App. 597, 226 S.E. 2d 744 (1976); *Bell v. State*, 128 Ga. App. 426, 196 S.E. 2d 894 (1973), also had the burden "to show that any information considered by the Magistrate other than that contained in the affidavit was under oath." Defendant points to Michael Whaley's testimony on voir dire that he orally apprised the judicial officer of certain information not contained in the affidavit. She urges the absence of a showing that this additional information was given under oath as a failure by the state to meet its burden under Georgia law. The Georgia cases said to require such a showing are *Campbell v. State*, 226 Ga. 883, 178 S.E. 2d 257 (1970); *State v. Bradley*, 138 Ga. App. 800, 227 S.E. 2d 776 (1976); and *State v. Causey*, 132 Ga. App. 17, 207 S.E. 2d 225 (1974). None of those cases, however, considered the qustion whether information not given under oath may supply probable cause for issuance of a warrant. *Campbell* and *Causey* each considered the sufficiency of an affidavit and other sworn testimony and found that probable cause had been shown. *Bradley* held that, where the information in the affidavit was defective, the state had failed to show that probable cause existed on the basis of further information the affiant testified he had related orally to the issuing officer. In the present case, where probable cause was clearly supplied by the affidavit, we perceive no error in the state's failure to show that additional information presented orally by the affiant was also in the form of sworn testimony.

[10] Defendant further contends that the seizure of Exhibits 79 and 81 was illegal under *Zimmerman v. State*, 131 Ga. App. 793, 207 S.E. 2d 220 (1974). That case held invalid the seizure of three typewriters by officers searching the defendant's warehouse pursuant to a warrant that specified "illegal weapons and explosives, sawed off shotguns, fully automatic rifles and fragmentation grenades." The officers had only a suspicion "based upon their experience" that the typewriters were stolen, though the suspicion

was subsequently confirmed. The Georgia Court of Appeals stated, 131 Ga. App. 794, 207 S.E. 2d 221:

> "The validity of the seizure must rest upon the provisions of Code Ann Sec 27-303(e) which provides in part: '. . . when the peace officer is in the process of effecting a lawful search, nothing in this section shall be construed as precluding him from discovering or seizing any stolen or embezzled property, any item, substance, object, thing or matter, the possession of which is unlawful, or any item, substance, object, thing or matter other than the private papers of any person which is tangible evidence of the commission of a crime against the laws of the State of Georgia.' In order to make a seizure under this provision of the law, the officer effecting it must have probable cause to believe that the articles seized were tangible evidence of the commission of crime."

Defendant argues that Georgia Code § 27-303, as construed in *Zimmerman*, renders the seizure of Exhibits 79 and 81 illegal because these weapons were neither (1) stolen or embezzled property, nor (2) items or objects the possession of which was unlawful, nor (3) items or objects which were tangible evidence of the commission of a crime against the laws *of the State of Georgia*. However, Georgia Code § 27-303 plainly does not restrict an officer executing a search to the seizure of objects in the categories enumerated by defendant. The language, "nothing in this section shall be construed as precluding him," merely provides that none of the things which follow are protected from seizure by that statute. This proviso does not purport to be an exhaustive listing of what may be seized in Georgia, and *Zimmerman* did not so costrue it. *Zimmerman* merely took the statute as the starting point for its probable cause analysis and concluded that no probable cause existed to believe the typewriters were evidence of criminal activity. As we have already shown, there was probable cause to believe Exhibits 79 and 81 were evidence in the very criminal activity under investigation. We do not believe Georgia law prohibited their seizure because the crime under investigation was committed in North Carolina.

Defendant's assignments of error directed to the admission of Exhibits 77, 79, and 81 are overruled.

### III

Defendant next assigns as error the trial court's denial of her motion for mistrial after defense counsel, Mr. Percy L. Wall, lost ninety percent of the hearing in his left ear during the course of trial. The trial began on Monday, 29 November 1976. Mr. Wall first mentioned his hearing problem to the court sometime on Wednesday. The problem became worse Thursday morning, and around 1:45 p.m. Mr. Wall went to the office of Dr. J. Gary Lee for an examination. The court heard defendant's motion for mistrial at 3:50 p.m. on Thursday.

At the hearing Mr. Wall informed the court that Dr. Lee had conducted numerous tests but had been unable to determine the cause of the hearing loss. Additional tests were scheduled for the next morning. Dr. Lee had indicated to Mr. Wall that the results of these tests might require his hospitalization and that he should stay off his feet at least seven to ten days pending diagnosis. Mr. Wall gave the court a note signed by Dr. Lee which read, "Mr. Wall has suffered a sudden sensorineural hearing loss in his left ear. I strongly advise that he not work for the next week or two minimum, depending on the cause of his problem. I would consider his attempting to continue with the ongoing trial as detrimental to any chance for recovery of his hearing." The court further ascertained that Attorney Z. H. Howerton, Jr., and Mr. Wall had been appointed initially to represent defendant and that both had worked on the case in preparation for trial, although the conduct of the trial itself was primarily Mr. Wall's responsibility. The record then shows:

"COURT: All right, let the record show that the trial of this case was begun on Monday, November 29th, that some forty-one witnesses have heretofore testified in the trial of this case; that several of these witnesses have been from the State of Georgia, one being from Washington, D. C., that there have been some 76 different exhibits identified in the course of this trial to date; that the district attorney advises that he only has two or three more witnesses to call; that two defense attorneys were appointed by the court to represent the defendant in February, 1976; that both of these attorneys have participated in the preparation of the case for trial; that Mr. Wall has conducted the cross examination of the State's witnesses, and upon statement of defense counsel,

Mr. Howerton has conducted extensive research; that the defendant through her counsel has stated that she intended to offer evidence in her defense; that the defense is ready or will be ready to go forward with their evidence with the exception of Mr. Wall's physical condition, and that Mr. Wall's physical condition is such, based on the certificate from the doctor, that if he continues in the trial of this case that it might be detrimental to the recovery of his hearing, he having suddenly lost the hearing or a portion of the hearing in the left ear; that Mr. Howerton has been a member of the Guilford County Bar for some twenty-five years; that to this court's knowledge Mr. Howerton has appeared on numerous occasions and in the court's opinion is an outstanding trial lawyer; that it is now three-fifty on Thursday afternoon, the trial of this case having been conducted during the normal court hours from Monday morning until twelve-thirty today; therefore, the court in its discretion denies the motion for a mistrial but will allow Mr. Wall to withdraw from the further participation in the trial of this case due to his physical condition and, in fact, this court would not attempt to force Mr. Wall to do anything which might jeopardize his health; however, the court is of the opinion that due to the length of the case, the nature of the case, and the evidence that has been presented, that the trial of this case should be continued by Mr. Howerton."

After the court had thus denied defendant's motion, there occurred this colloquy:

"MR. WALL: May I make a statement to the court?

"COURT: Yes, sir.

"MR. WALL: My client indicates to me that she feels that she cannot proceed during the course of the trial without me. I have been in the case since February and I have worked many, many hours on it. I have no intention of getting out of the case if it continues.

"COURT: Mr. Wall, I have excused you from continuation of the trial of this case.

"MR. WALL: No, sir, I am not going to leave this case, if your Honor please, if it is possible.

"COURT: Well, again, I am going on what the doctor recommended.

"MR. WALL: I understand.

"COURT: I certainly would not expect or impose any obligation on anyone whatsoever to continue the trial of this case.

"MR. WALL: I appreciate the court's position, and I am sure the court can appreciate my position. We are dealing here with something that is more important than expense or anything else. We are dealing with the liberty of an individual, and I feel so strongly that it is necessary that I remain in the case that I am going to stay in it.

"COURT: Well, I assume that would be against your doctor's recommendation, Mr. Wall, and I certainly do not quarrel with your doctor's recommendation."

Mr. Wall, adhering to the highest traditions of the legal profession, continued to represent defendant for the remainder of the trial. Defendant now claims that due to his physical impairment, Mr. Wall was not able to represent her effectively and that she was therefore deprived of effective assistance of counsel.

[11] The right to assistance of counsel is secured by the Sixth Amendment to the Federal Constitution, as applied to the states through the Fourteenth Amendment, and by the North Carolina Constitution, Article I, Sections 19 and 23. *Avery v. Alabama*, 308 U.S. 444 (1940); *Powell v. Alabama*, 287 U.S. 45 (1932); *State v. Harris*, 290 N.C. 681, 231 S.E. 2d 252 (1976); *State v. Sneed*, 284 N.C. 606, 201 S.E. 2d 867 (1974). This right is no mere formality but is designed to guarantee effective assistance of counsel. *Reece v. Georgia*, 350 U.S. 85 (1955); *Powell v. Alabama, supra; State v. Sneed, supra.*

Courts inquiring whether an accused has been denied effective representation have required a stringent standard of proof, stating the traditional test that no constitutional infirmity is shown "unless the attorney's representation is so lacking that the trial has become a farce and a mockery of justice." *State v. Sneed, supra* at 612, 201 S.E. 2d at 871, and authorities therein cited; Annot., 26 A.L.R. Fed. 218 (1976). This traditional test has

been criticized, *see e.g.*, J. Finer, Ineffective Assistance of Counsel, 58 Corn. L. Rev. 1077 (1973); H. Bines, Remedying Ineffective Representation in Criminal Cases: Departures From Habeas Corpus, 59 Va. L. Rev. 927 (1973), and it was recently rejected by the Fourth Circuit Court of Appeals in *Marzullo v. Maryland*, 561 F. 2d 540 (4th Cir. 1977). That court, relying on *McMann v. Richardson*, 397 U.S. 759 (1970), held the proper standard to be "representation within the range of competence demanded of attorneys in criminal cases." 561 F. 2d at 543. The Attorney General of Maryland filed a petition for certiorari with the United States Supreme Court on 2 December 1977, seeking review of the question whether *McMann* renders inapplicable at all stages of trial the traditional "farce or mockery" test for determining competency of counsel. 22 Crim. L. Rep. 4143 (11 January 1978). The Supreme Court has not yet acted on this petition. Whatever test we might apply in this case, however, there is simply nothing in the record to show that counsel's physical incapacity created a situation in which defendant was deprived of effective assistance of counsel.

[12]  Our research has disclosed surprisingly few cases involving the physical incapacity of counsel. Nearly all we have found held there was no denial of the right to effective assistance of counsel. *See e.g., United States ex rel Pugach v. Mancusi*, 310 F. Supp. 691 (S.D.N.Y. 1970); *People v. Schiers*, 160 Cal. App. 2d 364, 324 P. 2d 981 (1958), *rev'd on other grounds*, 19 Cal. App. 3d 102, 96 Cal. Rptr. 330 (1971); *see generally* Note, 49 Va. L. Rev. 1531, 1550-51 (1963); Annot., 74 A.L.R. 2d 1390, 1420-23 (1960); *but see State v. Keller*, 57 N.D. 645, 223 N.W. 698 (1929) (intoxication of counsel during trial entitled defendant to new trial). We think, however, and the cases seem to reflect, that the question does not turn on the physical incapacity of counsel as such, since this may or may not deprive a defendant of effective representation. Rather, it is necessary to examine counsel's specific acts or omissions which the defendant alleges constitute a denial of effective assistance. The reviewing court must approach such questions ad hoc and in each case view the circumstances as a whole. *State v. Sneed, supra*, 284 N.C. 606, 201 S.E. 2d 867 (1974). We also recognize that the trial judge, who actually sees the lawyer's behavior, is better able than an appellate court to evaluate the overall effectiveness of representation.

State v. Richards

Defendant contends that her attorney's loss of hearing rendered his assistance ineffective in that he was unable to object to the admission of certain incompetent evidence, to cross-examine properly some of the state's witnesses, and to present defendant's evidence effectively. We do not doubt defense counsel's assertion that his hearing difficulty left him frustrated and dissatisfied with his performance. Nevertheless, it does not appear from this record that defendant received ineffective representation or was prejudiced as a result of counsel's disability.

[13] In support of her contention that counsel failed to object to incompetent evidence defendant refers only to the admission of testimony concerning a letter written by Mrs. James Wertheimer on 25 October 1975. Before the letter was offered Mrs. Wertheimer had testified at length in corroboration of some of the testimony earlier given by her husband. She testified, for example, that she had overheard several conversations between her husband and defendant during which they "would talk about this dude and this deal they had going and that Bob was not feeding the information they needed." She said her husband had referred several times "to the fact that they were supposed to make a hit and that he and Mrs. Richards had been following this dude. He said the dude's name is Jack Conaghan. . . . They either called him a dude or a turkey." Mrs. Wertheimer heard all of this with a large measure of disbelief until, according to her testimony, she read in the obituary column of an Atlanta paper of the death of Jack Conaghan. She then testified that she panicked and wrote a "letter" which she placed in her safety deposit box. She read the letter to the jury without objection as follows:

"To Whom It May Concern, in the event of my death, accidental or otherwise, I want it made known that I have knowledge of the murder of John Charles Conaghan, and I wrote Jack in parentheses. This crime was committed by my ex-husband, James Harry Wertheimer, and his girl friend, Susan Richards, who were at this time residing in Smyrna, Georgia. I had been told so many lies by my husband that I assumed this was a lie, too, but this morning I read the obituaries and realized that he was telling the truth. He mentioned a man named Bob who drives a red Cadillac with a white landau top and claimed to be involved with a man

State v. Richards

named Frank who came from Miami to Atlanta to set up a prostitution ring between Chattanooga and Atlanta. Frank was supposedly killed around July 1, 1975. That's the day my husband came back from Chicago and moved in with Susan Richards. Between the two of them, they had four guns, two of which Jim built silencers out of lawn mower mufflers for. He has threatened my life and has told me he is the only thing protecting me from Susan Richards. Susan has a safety deposit box which contains further evidence. The key is kept in the ice tray in her freezer. All I ask is protection for my three children who are completely innocent and should be free of all involvement in any of this. I have signed it Judy H. Wertheimer. It is dated 10-25-75. At the bottom I wrote that the car used in the incident was a black and white Cadillac purchased from Doyle Richards in Brookhaven. My ex-husband drives a 1967 LeMans, License No. GLB-365. It's a navy blue convertible."

We are satisfied that whether counsel should have objected to this letter was largely a question of trial tactics and his failure to object is no indication that he was rendering ineffective assistance. The reference in the letter tying Wertheimer to some kind of prostitution ring and possibly the death of someone named Frank who was involved in the ring was helpful to defendant's theory of the case. This aspect of the letter was explored in detail on defendant's cross-examination of Mrs. Wertheimer. Defendant's defense theory as recited in her brief "was that the murder of John Conaghan was carried out by Wertheimer without her knowledge or assistance; that he had become involved with and obligated to certain criminal elements and that to discharge this obligation he killed Jack Conaghan; that he drove the Cadillac to Greensboro and left it to be picked up by someone who was connected with the criminal element and who may have assisted him in committing the murder." The bald conclusion in the letter that the crime was committed by Wertheimer and defendant might have been, strictly speaking, incompetent. It is beyond question, however, that the jury understood this letter to be based on what Mrs. Wertheimer had heard both from her husband and the defendant. Indeed the second question asked Mrs. Wertheimer on cross-examination by Mr. Wall brought out the fact that the information in the letter "came from my husband

State v. Richards

and from the obituary column in the newspaper." In essence her testimony tended to corroborate that of her husband, and the letter corroborates her testimony. Thus the letter, for the most part, is admissible as a prior consistent statement. *State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975); *State v. Bryant,* 282 N.C. 92, 191 S.E. 2d 745 (1972). Mr. Wall's cross-examination of Mrs. Wertheimer indicates that he was quite aware of the letter's contents. Whatever matter in the letter which might have been technically inadmissible was, when considered in context, inconsequential.

[14] We have searched the record in vain for any other indications that defendant was deprived of the effective assistance of counsel. Defense counsel's cross-examination of Judy Wertheimer covers more than five pages as summarized in the record. It is obvious that counsel understood her answers and developed his line of questioning accordingly. Mr. Wall's cross-examination of the state's chief witness, James Wertheimer, covers more than fourteen pages and similarly reflects not only effective but superb representation. Altogether Mr. Wall cross-examined thirty-two of the thirty-nine witnesses for the state, including every witness who testified after defendant's motion for mistrial was denied. After denial of the motion the record is replete with objections, motions to strike, and other instances of Mr. Wall's vigorous efforts.[1]

---

1. Note, for example, the following excerpt of the direct examination of Mr. J. R. Ash called in rebuttal by the state:

"Q. Mr. Ash, I place before you an item that has been marked for identification as State's Exhibit 79. What is State's Exhibit 79?

MR. WALL: Objection.

COURT: Overruled.

A. State's Exhibit 79 is a .38 caliber Smith and Wesson revolver.

MR. WALL: Motion to strike.

COURT: Motion denied.

Q. What occasion, if any, on the 2nd day of December, Mr. Ash, did you have to see that weapon?

A. We seized the weapon.

MR. WALL: If your Honor please, I object to this.

COURT: Objection overruled.

A. We seized this weapon in Apartment M-8 located at 1650 Austell Road pursuant to a search warrant.

Q. Where, Mr. Ash, if you know, was that weapon located?

A. In the bedroom of the apartment in the dresser drawer, I don't recall exactly which one.

State v. Richards

We hold that, notwithstanding Mr. Wall's hearing disability, his efforts and the assistance of Mr. Howerton provided defendant with effective legal representation throughout the proceedings. This assignment of error is overruled.

We find in this trial

No error.

---

Q. What, if any, other items were in the drawer where this—

MR. WALL: Objection to that.

Q. Where this particular weapon was recovered, Mr. Ash?

MR. WALL: I object to that.

COURT: Overruled.

MR. WALL: May I be heard just a minute?

COURT: Yes.

MR. WALL: This is rebuttal testimony that the State is offering. What can it rebut?

COURT: Overruled.

A. The other items located in the dresser drawer were ladies clothing, slips, panties, bras, and things of this nature.

MR. WALL: Move to strike.

COURT: Motion denied.

Q. Also referring to what is in front of you as State's Exhibit 80, what is Exhibit 80, please?

A. State's Exhibit 80 is a brown holster.

MR. WALL: Objection to that and move to strike.

MR. JOHN: I will withdraw any questions with regard to State's Exhibit 80."