Affirmed in part and reversed in part by published opinion. Judge NIEMEYER wrote the opinion, in which Judge TRAXLER joined. Judge KING wrote a separate opinion concurring in the judgment in part and dissenting in part.
OPINION
NIEMEYER, Circuit Judge.
A North Carolina jury convicted Robert Bacon of the murder of Glennie Clark and sentenced him to death. On appeal, the North Carolina Supreme Court vacated the death sentence, ruling that there was sufficient evidence to support a statutory mitigating circumstance that the trial court had failed to submit to the jury. Following a second sentencing hearing, a second jury again imposed the death penalty.
*473 After exhausting his direct appeals and state post-conviction remedies, Bacon petitioned the district court for a federal writ of habeas corpus, raising 28 claims of error that he contended justified issuance of the writ under 28 U.S.C. § 2254. The district court entered summary judgment in favor of the State on all of the claims except one. With respect to the one claim — that Bacon was denied effective assistance of counsel by the failure of his attorneys at the resen-tencing hearing to introduce evidence that he aided in the apprehension of his accomplice — the district court ordered an eviden-tiary hearing. After conducting this hearing, the court determined that Bacon had received ineffective assistance of counsel, rendering the result of his resentencing hearing “fundamentally unfair, or at the very least, unreliable.” Accordingly, the court granted the writ on this claim.
North Carolina filed this appeal to challenge the district court’s order granting the writ, and Bacon filed a cross-appeal challenging the court’s rulings rejecting six of his other claims for relief. For the reasons that follow, we reverse the district court’s grant of the writ based on the ineffective assistance of counsel and affirm its rulings rejecting Bacon’s other claims for relief.
I
Robert Bacon was convicted and sentenced to death for the February 1, 1987 murder of Glennie Clark, the estranged husband of Bacon’s lover, Bonnie Sue Clark.
Bonnie Sue and Glennie Clark were married in 1982 and had two children. Because Glennie became an alcoholic and physically abusive, see State v. Clark, 324 N.C. 146, 377 S.E.2d 54, 57-58 (1989); State v. Bacon, 326 N.C. 404, 390 S.E.2d 327, 330 (1990) (hereinafter “Bacon I”), Bonnie Sue moved out of the house in 1986 and took up residence with Bacon, who was a coworker, and another friend, see Clark, 377 S.E.2d at 58. Despite their separation, Glennie continued to harass Bonnie Sue by telephone, and “ ‘the worse things got’ between her and her husband, the closer she drew emotionally and romantically to Bacon.” Id.
Bonnie Sue confided in Bacon about her difficulties with Glennie and “at some point ... told [Bacon] that she wished her husband was dead and did he know of anyone who would kill him.” Bacon I, 390 S.E.2d at 330. Bacon “finally agreed to kill [Glen-nie],” and Bonnie Sue and Bacon planned the murder for January 31, 1987. Id. Bonnie Sue was the beneficiary of Glennie’s life insurance policies totaling $130,000, and Bacon reportedly told acquaintances that he expected to receive a large inheritance. See State v. Bacon, 337 N.C. 66, 446 S.E.2d 542, 565 (1994) (hereinafter “Bacon II”).
Under the plan, Bonnie Sue was to accompany Glennie to a movie theater, where Bacon would kill him, but Bacon “ ‘chickened out’ when it came time to execute the plan.” Id. The following night, February 1, 1987, again pursuant to plan, see Clark, 377 S.E.2d at 58, Bonnie Sue and Bacon drove to Glennie’s house to pick him up. Glennie reacted angrily when he saw Bacon in the back seat of Bonnie Sue’s car, and a heated discussion ensued about Bonnie Sue’s relationship with Bacon. See Bacon I, 390 S.E.2d at 329-30. At some point, Glennie called Bacon a “nigger,” see id., prompting Bacon to grab a knife that he had earlier placed on the floor of the car and fatally stab Glennie 16 times, see Bacon II, 446 S.E.2d at 565. Bonnie Sue then drove to a movie theater parking lot, where Bacon’s car was parked. Bacon and Bonnie Sue decided to fake a robbery to cover up the murder, and pursuant to this ploy, Bacon knocked Bonnie Sue unconscious and went home in his car. See id.
Shortly after 11:00 p.m. on the same day, the police found Bonnie Sue slumped over the steering wheel of her car next to Glennie’s dead body. See Bacon II, 446 S.E.2d at 565. Bonnie Sue told Jacksonville Police Officer J.J. Phillips that she *474 and Glennie had been sitting in the ear when the car doors were suddenly opened and she heard her husband exclaim, “Oh God, don’t,” before she was knocked unconscious. Bonnie Sue repeated this story to members of the rescue squad and to Sergeant Donna Waters who transported her to a hospital. She also told investigating officers that her two children were at home with a babysitter and gave them her home address.
Several hours later, at 1:15 a.m. on February 2, 1987, Sergeant Dennis Dinota picked Bonnie Sue up at the hospital and drove her to the Jacksonville police station where she again repeated the story she had told Officer Phillips and Sergeant Waters, and at approximately 2:00 a.m., she began writing out a statement describing how she had been attacked in the movie theater parking lot by two unknown individuals.
In the meantime, Jacksonville Deputy Chief Delma Collins went to the home shared by Bacon and Bonnie Sue to check on Bonnie Sue’s children. Officer Collins arrived at 1:20 a.m. and was met at the door by Bacon, who invited Collins and other officers in the house and allowed them to “look around.” After the officers discovered bloody clothing and shoes, Bacon confessed that he had killed Glennie Clark and directed the officers to other incriminating evidence. Bacon recounted that he “had been in the automobile with Bonnie Sue Clark and the victim, Glennie Leroy Clark; the victim called him a ‘nigger ’ and pulled a knife on him; he grabbed the knife from the victim and stabbed him; and, all of this took place while Bonnie Sue Clark was in the vehicle.” Bacon I, 390 S.E.2d at 335. Bacon denied, however, that Bonnie Sue was involved in the crime.
Back at the police station, Bonnie Sue completed writing out her statement for Sergeant Dinota at 2:45 a.m. After Deputy Chief Collins informed Sergeant Dinota of the information he had learned about Bacon’s involvement in the crime, the officers confronted Bonnie Sue with the information and, at 3:05 a.m., informed her of her Miranda rights. Later, Bacon admitted that parts of the story he had originally told to officers were false and admitted that he and Bonnie Sue had planned the crime.
Bacon was tried and convicted of first-degree murder and conspiracy to commit murder and sentenced to death.[1] Bacon I, 390 S.E.2d at 328. On direct appeal, the North Carolina Supreme Court upheld Bacon’s conviction but found that evidence presented to the jury concerning Bacon’s role in the police investigation of Bonnie Sue’s involvement in the murder supported a jury instruction on the statutory mitigating circumstance of “aid[ing] in the apprehension of another capital felon.” N.C. Gen.Stat. § 15A-2000(f)(8). Because no such “(f)(8)” instruction was given, the Supreme Court remanded the case for resentencing. See Bacon I, 390 S.E.2d at 328-29.
At Bacon’s resentencing hearing, Bacon’s counsel presented testimony by character witnesses who had testified in the first sentencing hearing. They also presented testimony by an expert witness, Dr. Billy Royal, a psychiatrist who testified about Bacon’s family background and psychological profile. Unlike at the first sentencing hearing, the State did not introduce testimony by the officers who investigated the murder, relying instead primarily on Bacon’s own testimony in the first sentencing hearing. The trial court submitted to the jury one aggravating circumstance — that the murder was committed for pecuniary gain — and 21 mitigating factors. The court did not, however, submit the (f)(8) mitigating factor because no evidence had been presented by the State or by Bacon that “showed the exact timing *475 of [Bacon’s] statements [to police] or their relation to the custodial status of [Bonnie Sue] Clark.” Bacon II, 446 S.E.2d at 560.
The jury found the existence of the single aggravating circumstance that the murder had been committed for pecuniary gain and also found the existence of nine mitigating circumstances: that Bacon
had no significant history of prior criminal activity; acted under the domination of another person; had no history of violent behavior; had character, habits, mentality, propensities and activities indicating that he is unlikely to commit another violent crime; had committed the murder as the result of circumstances unlikely to recur; had established that his co-defendant, Bonnie Sue Clark, had received a life sentence; had shown remorse since his arrest; and had a family who loved him, continued to visit him while he [was] incarcerated, and would continue to do so if he were sentenced to life in prison.
Bacon II, 446 S.E.2d at 565. This jury also recommended the sentence of death, which the trial court imposed. Bacon pursued direct appeals, culminating in a second appeal before the North Carolina Supreme Court, which rejected his various claims of error and affirmed the death sentence. Id. at 570.
On September 25, 1995, Bacon initiated post-conviction proceedings by filing a motion for appropriate relief (“MAR”) in the Superior Court of Onslow County (“the state MAR court”). On the same date, he filed a “Notice of Intention to Amend,” in which he outlined various claims that were not addressed in the MAR because they required additional investigation and research. Pursuant to a motion by the State, the state MAR court summarily denied Bacon’s MAR on November 20, 1995. Almost three months later, on February 15, 1996, Bacon filed a motion to reconsider the denial of his MAR and for leave to amend it. The state MAR court granted Bacon’s motions for reconsideration of the court’s November 20, 1995 order dismissing the MAR and for leave to amend his MAR, and on May 6, 1996, heard oral argument on the claims raised in Bacon’s MAR and amended MAR.
On May 10, 1996, the state MAR court issued an order denying all of Bacon’s claims, stating that it did not “have the authority to amend, modify, or vacate the [November 20, 1995] order denying the defendant’s Motion for Appropriate Relief.” The court found that Bacon’s amended MAR was
in effect, a second Motion for Appropriate Relief since there was no pending Motion for Appropriate Relief to amend. The Court’s order of November 20,1995, was, and is, a final order. For this reason, [Bacon’s] allegations as set out in [the claims made in the amended MAR] are procedurally barred.
Bacon sought and was denied certiorari review by the North Carolina Supreme Court and the United States Supreme Court. See State v. Bacon, 345 N.C. 348, 483 S.E.2d 179 (1997); Bacon v. North Carolina, 522 U.S. 843, 118 S.Ct. 124, 139 L.Ed.2d 75 (1997).
Bacon filed this petition for federal ha-beas relief on November 26, 1997. Bacon’s petition presented 28 claims that he contended justified this relief pursuant to 28 U.S.C. § 2254. The district court granted the State’s motion for summary judgment as to all but one of the claims; with respect to the remaining claim — that Bacon’s attorneys at his resentencing hearing had rendered him ineffective assistance of counsel by failing to present evidence of the (f)(8) mitigating circumstance — the district court conducted a hearing and ultimately determined that Bacon had received ineffective assistance of counsel, which rendered the result of his resentencing hearing “fundamentally unfair, or at the very least, unreliable.” Based upon this finding, the district court granted the writ on this claim. These appeals followed.
*476 II
North Carolina contends first that Bacon’s (f)(8) claim — that he was denied effective assistance of counsel because counsel failed to present evidence that Bacon aided in the apprehension of another capital felon — was procedurally defaulted. Bacon, the State argues, did not raise this claim in his first MAR even though he wa,s in a position to do so, and when he did first raise it in his amended MAR, it was procedurally defaulted.
The district court rejected the State’s argument that Bacon’s claim was procedurally defaulted. Although the court acknowledged that North Carolina’s statute imposing the procedural bar relied upon by the state MAR court was “generally” an independent and adequate State-law ground that would give rise to procedural default of the same claims on federal habe-as review, it found that there were few reported incidences of the bar being applied in circumstances similar to the present case. Consequently, it concluded that it could not “apply the doctrine of procedural default” in the circumstances “as they are before this court.”
A federal habeas court may not review a claim when a state court has declined to consider its merits on the basis of an independent and adequate state procedural rule. See Coleman v. Thompson, 501 U.S. 722, 731-32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Harris v. Reed, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). A state procedural rule is independent if it does not “depend[ ] on a federal constitutional ruling,” Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and is adequate if it is regularly and consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).
While the state MAR court did not cite authority for its treatment of Bacon’s claim as procedurally barred, it appears that the court was relying on § 15A-1419(a) of the North Carolina Criminal Procedure Act, which provides, in pertinent part:
The following are grounds for the denial of a motion for appropriate relief, including motions filed in capital cases:
(1) Upon a previous motion made pursuant to [Article 89, Motion for Appropriate Relief and Other Post-Trial Relief], the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so. This subdivision does not apply when the previous motion was made within 10 days after entry of judgment or the previous motion was made during the pen-dency of the direct appeal.
N.C. Gen.Stat. § 15A-1419(a)(l). We have consistently held that this provision constitutes an independent and adequate state ground that may give rise to procedural default of federal habeas claims. See Boyd v. French, 147 F.3d 319, 332 (4th Cir.1998); Ashe v. Styles, 39 F.3d 80, 87-88 (4th Cir.1994); see also O’Dell v. Netherland, 95 F.3d 1214, 1241 (4th Cir.1996) (en banc) (holding that unambiguous procedural rules derived from state statutes or court rules are necessarily “firmly established”).
Bacon concedes that § 15A-1419(a)(l) “generally” provides a basis for a valid procedural default. But he contends that in this case, the application is novel and not firmly established. See McCarver v. Lee, 221 F.3d 583, 589 (4th Cir.2000) (“The question we must ask ... is whether the particular procedural bar is applied consistently to cases that are procedurally analogous”).
Bacon contends that the state MAR court’s order granting reconsideration of his dismissed MAR “resurrected” the MAR and delayed the date of final judg *477 ment. State v. Basden, 350 N.C. 579, 515 S.E.2d 220, 222 (1999) (holding that a court’s decision to reconsider an earlier order dismissing a MAR caused the MAR “to be pending before [that] court until it was again denied”). He thus argues that his February 15, 1996 amended MAR, while arguably a second or successive MAR under § 15A-1419(a)(l), revived the original MAR with amendments when the court granted his motion for reconsideration.
The State argues that the state MAR court was deprived of its authority to reopen the original MAR because the motion for reconsideration was untimely. It argues that the common-law rule that a judgment cannot be altered after the end of the term of court in which it issued applied in this case. See State v. Godwin, 210 N.C. 447, 187 S.E. 560, 561 (1936) (“Until the expiration of the term the orders and judgments of the court are in fieri, and the judge has power, in his discretion, to make such changes and modifications in them as he may deem wise and appropriate for the administration of justice”). But there is some basis for doubting whether this common-law rule applies in the MAR context. See N.C. Gen.Stat. § 7A-47.1; In re Burton, 257 N.C. 534, 126 S.E.2d 581, 585 (1962). Moreover, Bacon has pointed to a number of reported and unreported cases in which a MAR court has granted reconsideration after the term of court had expired.
Because the state MAR court reopened the original MAR, the question of whether a governing state rule was regularly and consistently applied to treat a motion to amend thereafter as a second MAR is in some doubt. While it is not our role to resolve the issue or to review the correctness of the state MAR court’s application of its state-law procedural rules, we must nevertheless assure ourselves that the rule applied is a “firmly established and regularly followed state practice.” Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). In this case, that assurance is elusive. Because we ultimately conclude that the assertedly defaulted claims are without merit, we will exercise our prerogative to decide Bacon’s claims on the merits rather than on grounds of procedural default. See Royal v. Taylor, 188 F.3d 239, 247 (4th Cir.1999).
Ill
The State contends, on the merits of Bacon’s (f)(8) claim, that the state MAR court’s ruling rejecting this claim was not “contrary to” or “an unreasonable application of’ the federal law governing the effective assistance of counsel. It argues that the district court erred in concluding otherwise.
The district court found that Bacon’s counsel at the 1991 resentencing hearing had failed to put forth available evidence that would support the mitigating circumstance that Bacon aided in the apprehension of another capital felon, as recognized by N.C. Gen.Stat. § 15A-2000(f)(8).[2] The court found this failure “startling considering the virtual roadmap laid out by the North Carolina Supreme Court.” The district court concluded that this failure was constitutionally deficient and also that there was a reasonable probability that, but for the failure to present the evidence, a life sentence might have resulted. Accordingly, the district court ruled that Bacon had “not receive[d] effective assistance of counsel as guaranteed him by the Sixth Amendment” and that the state MAR court’s decision rejecting Bacon’s (f)(8) ef *478 fectiveness claim was thus “contrary to or involved an unreasonable application of the clearly established Federal law as determined by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).”
In addressing the merits of Bacon’s claim that he was deprived of the effective assistance of counsel by their failure to present evidence supporting the (f)(8) mitigating circumstance, we apply the standard of review established by the Antiter-rorism and Effective Death Penalty Act of 1996. Because the state MAR court dismissed Bacon’s claim on the merits (as well as on the basis of the state procedural bar), we confíne our review to whether the court’s determination “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). Where, as here, a state court summarily rejects a claim without articulating reasons, its order nevertheless constitutes an “adjudicat[ion] on the merits” for purposes of § 2254(d). See Cardwell v. Greene, 152 F.3d 331, 339 (4th Cir.1998); Wright v. Angelone, 151 F.3d 151, 156-57 (4th Cir.1998). But because we have “no indication of how the state court applied federal law to the facts,” we must “necessarily perform [our] own review of the record.” Cardwell, 152 F.3d at 339; see also Green v. Catoe, 220 F.3d 220, 223 (4th Cir.2000). To prevail on his ineffective-assistance-of-counsel claim, Bacon must meet two well established requirements. First, he “must show that counsel’s representation fell below an objective standard of reasonableness.” Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This is a difficult showing to make because in assessing the reasonableness of counsel’s course of action, “[o]ur review ... is highly deferential” to counsel. Wilson v. Greene, 155 F.3d 396, 403 (4th Cir.1998) (citing Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Second, he must demonstrate “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
Bacon contends that the North Carolina Supreme Court gave his attorneys a “virtual roadmap” of the evidence that would support an (f)(8) mitigating-circumstance instruction, when the court in Bacon I stated:
The record reveals that on the night of the murder Bonnie Sue Clark told the police that mysterious assailants had opened her car door and slammed her head against the steering wheel thus rendering her unconscious. She was unable to provide further information as to her assailants. After being examined at the hospital, she reiterated her exculpatory statements and reduced them to writing at the police station. See State v. Clark, 324 N.C. 146, 377 S.E.2d 54 (1989). At approximately the same time, [Bacon] told police officers that: he had been in the automobile with Bonnie Sue. Clark and the victim, Glennie Leroy Clark; the victim called him a “nigger” and pulled a knife on him; he grabbed the knife from the victim and stabbed him; and, all of this took place while Bonnie Sue Clark was in the vehicle. It was at this point that the investigators first began to focus on Bonnie Sue Clark as a possible accomplice in the murder. Obviously if [Bacon’s] version of the events was proven true, then Bonnie Sue Clark was lying. [Bacon’s] story did not turn out to be totally accurate with respect to motive, intent, etc. However the fact that defendant, not mysterious assailants, did the killing was sufficient to arouse the suspicions of the investigating police officers as to Bonnie Sue’s role in this killing. This is sufficient to submit the mitigating circumstance of aiding “in the apprehension of another capital felon” to the jury. It was error not to do so.
*479 Bacon I, 390 S.E.2d at 335 (emphasis added).
The court’s decision in Bacon I, however, clearly did not deal with attorney error but with the trial court’s instructional error. The conduct of Bacon’s attorneys at the resentencing hearing, accordingly, must be judged not in light of the circumstances reviewed by the North Carolina Supreme Court in Bacon I, but on the particular circumstances of the resentenc-ing hearing. As the Supreme Court has emphasized, “no particular set of detailed rules for counsel’s conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel’s conduct on the facts of the particular case, viewed as of the time of counsel’s conduct, and judicial scrutiny of counsel’s performance must be highly deferential.” Roe v. Flores-Ortega, 528 U.S. 470, 120 S.Ct. 1029, 1034-35, 145 L.Ed.2d 985 (2000) (internal citations and quotation marks omitted).
The evidence that the North Carolina Supreme Court viewed as supporting the (f)(8) instruction had been introduced in the first sentencing hearing by the prosecution through the testimony of the police officers who investigated the murder. At resentencing, however, the prosecution took a different tack, choosing not to call the officers as witnesses. This altered the strategic landscape, and Bacon’s attorneys could have considered that the officers, if called to the stand, would provide testimony that was more damaging to Bacon’s cause than helpful.
Weighing the danger of damaging testimony by the police officers, Bacon’s attorneys also had to consider that the evidence supporting the (f)(8) mitigating circumstance might provide only a slight benefit. While the North Carolina Supreme Court held that the form of “aid” that Bacon provided would support a jury instruction, it was by no means an unequivocal demonstration of a purposive effort by Bacon to assist in the police investigation. Bacon at first insisted that Bonnie Sue was “not involved.” It was only after Bonnie Sue had received Miranda warnings and Bacon had been confronted with additional evidence that Bacon admitted that he and Bonnie Sue had “planned to get rid of’ Glennie Clark. The aid Bacon gave before police suspicion was trained on Bonnie Sue came from the fact that he confessed to his own involvement and gave an account of the murder that was inconsistent with the cover story upon which he and Bonnie Sue had agreed. Bacon’s attorneys could reasonably have concluded that the jury would give little weight to this inadvertent form of assistance in apprehending Bonnie Sue.
In view of the tactical considerations confronted by counsel, we cannot conclude that their failure to present evidence of the (f)(8) mitigating circumstance at Bacon’s resentencing hearing fell “outside the wide range of professionally competent assistance.” Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Accordingly, the state MAR court’s denial of this claim was not contrary to, or an unreasonable application of Strickland, see 28 U.S.C. § 2254(d)(1), and the district court’s order denying summary judgment on this claim and granting Bacon the writ of habeas corpus must be reversed.
IV
On his cross-appeal, Bacon contends first that the district court erred in rejecting claims that his counsel were ineffective (1) by failing to fully investigate mitigating evidence and present it to the 1991 sentencing jury; (2) by presenting videotaped testimony that referred to his possible parole if sentenced to life imprisonment; (3) by informing the jury that he had been sentenced to death at the first sentencing hearing; and (4) by reading into the record excerpts of the transcript of Bacon’s testimony from the first sentencing hearing.
*480 The state MAR court rejected some of these claims because they were procedurally defaulted and rejected all of them on the merits. The district court denied all of these claims on the merits. Because these claims were either not procedurally defaulted or the procedural default was questionable for the reasons given in Part II, supra, we address each claim on the merits.
A
Bacon’s first ineffective-assistance-of-counsel claim is based on his contention that his counsel should have conducted a more thorough investigation into his background. According to Bacon, “[h]ad counsel conducted a proper investigation of [his] case, testimony could have been presented from a large number of family members, teachers, and friends. These witnesses could have personally and poignantly described events that shaped [his] character and helped to explain why Bonnie Clark was able to manipulate Robert into killing her husband.” Similarly, Bacon asserts that diligent investigation by his attorneys would have produced evidence of his positive adaptation to incarceration.
The district court determined that Bacon’s claim of ineffective assistance of counsel was meritless and that the state MAR court’s summary rejection of the claim on the merits was therefore not an unreasonable application of “Strickland and its progeny” to the facts of this case.
After the North Carolina Supreme Court vacated Bacon’s first death sentence and ordered a new sentencing hearing, his attorneys did not conduct an additional investigation into Bacon’s background or his prison record[3] but relied instead on the information they had gathered in preparation for the first sentencing hearing. In 1987, two months prior to Bacon’s capital trial, his counsel, together with a member of the prosecution team, traveled to Ayer, Massachusetts, where Bacon grew up and lived most of his life, and spent a weekend there interviewing Bacon’s friends and former neighbors. Sixteen of these interviews were videotaped, and portions of the videotaped interviews were presented at both the 1987 sentencing hearing and the 1991 resentencing hearing. At the resentencing hearing, the jury also heard from Dr. Billy Royal, a defense psychiatrist, who related information about Bacon’s background, which he had gleaned from discussions with Bacon and his sister, from prison records, from testimony given at Bacon’s trial and first sentencing hearing, and from psychological tests taken by Bacon.
The North Carolina Supreme Court summarized as follows the testimony thus presented by Bacon’s counsel at the resen-tencing hearing:
[Bacon] presented further testimony at the resentencing proceeding from numerous friends and family members that he was an affable, pleasant person; a good student who never gave any trouble; giving and a leader; always there to help; not one to hurt anybody; popular in school and involved in sports-related activities; a clean-cut Md and a fine young man; a very trustworthy young man who had the ability to excel in anything that he wanted to start as far as life at school or business; and an upright citizen with unquestionable character.
Dr. Billy Royal, a psychiatrist, described [Bacon] as “pleasant,” of “average intelligence,” and relatively unemotional, with “a very limited view of himself and not a very good self image in terms of being very successful in life.” Dr. Royal opined that the mur *481 der resulted from the meshing of the psychological needs of [Bacon] and co-conspirator Bonnie Sue Clark. [Bacon] “had a history ... of becoming involved [with] people that were in need . of assistance” and tried “to help rescue Ms. Clark from her reported abuse by her husband.” It was the racial slurs, however, directed at [Bacon] by Sergeant [Glennie] Clark in the car that “resulted in his [losing] control.” The murder was thus an “impulsive act,” and even though [Bacon] stabbed Sergeant Clark some sixteen times, [Bacon] was “a very angry frustrated person at the time.” Dr. Royal concluded that [Bacon’s] capacity “to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law” at the time of the killing was impaired and the murder was committed while [Bacon] was “under the influence of [a] mental or emotional disturbance.”
Bacon II, 446 S.E.2d at 549.
Bacon asserts that a more diligent investigation of his background would have produced evidence showing that he did not have a positive relationship with his father; that his father was an inveterate adulterer; that Bacon’s mother enlisted him in her efforts to uncover his father’s infidelity; that as a result of tensions in the home, Bacon developed a serious bedwetting problem that persisted until he was 14 or 15 years old; that he was well-liked by his teachers and classmates; and that he stopped fights and protected others at school. Bacon contends that “[t]he relevance and mitigating value of this evidence in a case where [Bacon] was recruited by an abused woman to kill her alcoholic abuser is patent.”
In evaluating a claim that a defendant received ineffective assistance of counsel because counsel conducted an inadequate investigation, the “decision not to investigate must be' directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052. Thus, we review counsel’s judgments not for what is “prudent or appropriate, but only what is constitutionally compelled.” United States v. Cronic, 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). And a decision not to investigate further is “reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052.
In this case, Bacon’s counsel could reasonably have concluded, based on their earlier investigation, that the evidence they had developed and would be presenting would give the jury an accurate picture of Bacon’s personality and that further investigation into Bacon’s background would not be fruitful. Such a determination could be based on their view that any further evidence would be cumulative or that the unhappy circumstances of Bacon’s childhood would not have substantial mitigating value in the eyes of the jury. See Royal v. Taylor, 188 F.3d 239, 249 (4th Cir.1999) (“[R]eliance on evidence of psychological impairments or personal history as mitigating factors in sentencing can be a ‘double-edged sword’ ” (quoting Wright v. Angelone, 151 F.3d 151, 162 (4th Cir.1998))); Plath v. Moore, 130 F.3d 595, 601-02 (4th Cir.1997) (failure to “make an exhaustive examination of [the defendant’s] background and mental state” was not unreasonable in light of other mitigating evidence presented); Turner v. Williams, 35 F.3d 872, 902 (4th Cir.1994) (“[Counsel] thought it might offend some members of the rural Virginia jury if they emphasized [the defendant’s] deprived upbringing or suggested that one might commit murder as a result of it”), overruled on other grounds by O’Dell v. Netherland, 95 F.3d 1214, 1222 (4th Cir.1996) (en banc); see also Card v. Dugger, 911 F.2d 1494, 1511 (11th. Cir.1990) (“[E]mphasizing a client’s deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many *482 jurors have had difficult lives, but have not turned to criminal conduct”); Parks v. Brown, 840 F.2d 1496, 1509-10 (10th Cir.1987) (holding counsel’s decision not to call a succession of character witnesses at a capital sentencing hearing a reasonable tactical decision, and noting that the exposure of defendant’s life history might well have prejudiced him further in the eyes of the jury), rev’d on other grounds, 860 F.2d 1545, 1548 (1988) (en banc), rev’d sub nom. Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).
Notwithstanding these considerations supporting counsel’s decision not to develop further mitigating evidence, Bacon argues that the Supreme Court’s recent decision in Williams (Terry) v. Taylor, — U.S.-, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), requires that Bacon be given an evidentiary hearing on this issue. In Williams (Terry), the defendant’s counsel began preparations for the sentencing phase of the proceedings only a week before trial and “failed to conduct an investigation that would have uncovered extensive records graphically describing Williams’ nightmarish childhood” that was “filled with abuse and privation.” Id. at 1514, 1515. His counsel also “failed to introduce available evidence that Williams was ‘borderline mentally retarded.’ ” Id. at 1514. The jury in Williams’ case also did not learn that his “parents had been imprisoned for the criminal neglect of Williams and his siblings,” id., or that he had received “prison commendations ... for his help in breaking up a prison drug ring and for returning a guard’s wallet,” id. at 1502 n. 4. The only evidence that Williams’ counsel did offer in mitigation was that Williams had “turned himself in ... expressing remorse for his actions, and cooperating with the police after that.” Id. at 1515.
It hardly bears noting that the omitted evidence in Williams (Terry), unlike the evidence omitted in this case, was not cumulative of the evidence that had been presented, and would have been more likely to “influence[] the jury’s appraisal of [the defendant’s] moral culpability.” Williams (Terry), — U.S. at -, 120 S.Ct. at 1515. While the Court held that trial strategy could not be a justification for the failure of Williams’ counsel to develop and present the available mitigating evidence, we cannot say the same with respect to the strategy of Bacon’s counsel. We therefore conclude that the state MAR court’s denial of this claim on the merits was not an unreasonable application of Strickland.
B
Bacon also contends that the performance of his counsel at the resentencing hearing was constitutionally deficient because they presented videotaped depositions of Bacon’s friends and former neighbors that contained explicit or implicit references to his possible parole if sentenced to life imprisonment. Because Bacon made this argument on direct appeal to the North Carolina Supreme Court, which rejected it, see Bacon II, 446 S.E.2d at 554-55, our review is limited to determining whether the North Carolina Supreme Court’s rejection of this claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1); see also Williams (Terry), — U.S. at -, 120 S.Ct. at 1523.
The videotaped depositions of Bacon’s friends and former neighbors generally provided testimony of Bacon’s peaceful nature and good character. Bacon’s counsel asked one witness, “You think if Robert was given life in prison and served whatever number of years he served and was released, he would be welcomed back in this community?” The witness responded, “I would welcome him. I think his friends would welcome him.” A second witness was asked, “If the jury does sentence Robert to life in prison and he serves a number of years, and he’s released or paroled, *483 would you welcome him back in the community, knowing that he’s been convicted of first-degree murder?” This witness also responded in the affirmative. Two other witnesses were asked, without explicit reference to the possibility that Bacon could be paroled, whether they would welcome Bacon into their homes. Both witnesses stated that they would.
Disposing of Bacon’s claim, the North Carolina Supreme Court found that
the thrust of the questions posed to these witnesses, dwelt upon [Bacon’s] purported good character and how out of character the killing was. The references to parole all occurred in the context of [Bacon’s] former friends and their unchanged favorable view of him following his conviction. We do not believe defense counsel acted unreasonably in eliciting this favorable testimony.
Bacon II, 446 S.E.2d at 554. The court thus found that the performance of Bacon’s counsel in presenting this testimony did not fall below an objective standard of reasonableness. We cannot conclude that this determination was contrary to, or involved an unreasonable application of, the first prong of the Strickland test. See 466 U.S. at 688, 104 S.Ct. 2052.
C
Bacon contends that his counsel’s performance was similarly deficient because they informed the jury that Bacon had previously been sentenced to death by another jury. Again, because this argument was presented to and rejected by the North Carolina Supreme Court, see Bacon II, 446 S.E.2d at 555, we determine only whether that court’s decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1).
While cross-examining defense psychiatrist Dr. Billy Royal, the state prosecutor elicited testimony regarding the presence at Bacon’s first trial of several members of Bacon’s family, who were absent from the resentencing proceeding. During closing arguments, Bacon’s counsel sought to explain this absence, saying:
But it doesn’t mean they don’t care. Robert’s mother testified in the original trial.[1] She was here. And Robert’s mother had to sit herd in the courtroom and listen to a judge impose a death penalty on her son. And so I suggest that it shouldn’t surprise you that she’s not here again.
Bacon contends that this mention of his previous sentence was prejudicial and tainted the jury’s decision. He argues that the jury was much more likely to impose a sentence of death knowing that a previous jury had recommended death.
Disposing of this claim on direct appeal, the North Carolina Supreme Court stated:
We deem [defense counsel’s closing] argument a trial tactic to explain the absence of [Bacon’s] mother. See State v. Richards, 294 N.C. 474, 500, 242 S.E.2d 844, 860 (1978). In addition, mere knowledge by the jurors of the prior death sentence does not necessarily demonstrate prejudice to the defendant. See State v. Simpson, 331 N.C. 267, 271, 415 S.E.2d 351, 353-54 (1992). We conclude that defendant has failed to show that his counsel performed below an objective standard of reasonableness or that actual prejudice resulted.
Bacon II, 446 S.E.2d at 555. The district court found that the North Carolina Supreme Court’s application of the Strickland test was not unreasonable, even though the district court expressed concerns about “the competence of any attorney who would mention the prior death penalty of his client in any context.” We agree with the district court’s conclusion.
Counsel submitted to the jury the mitigating circumstance “[t]hat the defendant’s family loved him, has continued to visit him while he [was] incarcerated, and will continue to do so if he is sentenced to life imprisonment.” Counsel might have con- *484 eluded that the absence of Bacon’s mother from the courtroom would severely undermine this contention. By alluding to the emotional anguish a mother would feel upon seeing her son sentenced to death, counsel provided an explanation for the absence of Bacon’s mother and appealed to the jury’s sympathies. And indeed, the jury ultimately found this mitigating circumstance to exist and to have mitigating value.[4]
The “highly deferential” form of review prescribed by Strickland requires us to “indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Accordingly, we conclude that the North Carolina Supreme Court’s determination that Bacon’s counsel did not provide constitutionally deficient assistance when he informed the jury of the prior death sentence was not contrary to or an unreasonable application of Strickland.
D
Finally, Bacon claims that he was rendered ineffective assistance of counsel because his attorney read into the record at the resentencing hearing damaging portions of Bacon’s testimony from the first sentencing hearing, which he contends amounted to “helping the State present its case for death.” The state MAR court summarily denied the claim, stating only that “[t]he affidavits and the record do not support the claim that the defendant’s counsel were deficient ... or that he was prejudiced thereby.” The district court also concluded on the merits that “counsel’s decision to read the entirety of his client’s trial testimony into the record was the type of tactical decision to which Strickland requires deference.”
Although Bacon testified at the first sentencing hearing in 1987, he elected not to do so at the 1991 resentencing hearing. Nonetheless, much of Bacon’s 1987 testimony was read into the record. In presenting this testimony, Bacon’s counsel read aloud the questions he had asked Bacon on direct examination in the first sentencing hearing, as well as Bacon’s responses, and the prosecutor read aloud the questions asked on cross-examination and Bacon’s answers. According to Bacon, this testimony was “extremely damaging,” particularly Bacon’s statements that he was not in love with Bonnie Sue Clark and “would have never been in love with her,” which tended to undermine Bacon’s efforts to rebut the State’s theory that the murder was committed for pecuniary gain. Bacon now contends that, by participating in the presentation of this evidence, his counsel abandoned his role as an advocate and “acted as an adjunct to the prosecution.”
We cannot agree with Bacon’s characterization. As the district court recognized, Bacon’s prior testimony would have been admissible at the resentencing hearing in any event as admissions of a party-opponent. See N.C.R. Evid. 801(d)(A). Bacon’s counsel could reasonably have determined that by reading the testimony himself, he could “remove the sting” better than if it were read entirely by the prosecutor. Ohler v. United States, - — U.S. -, -, 120 S.Ct. 1851, 1854, 146 L.Ed.2d 826 (2000) (discussing defense strategy of preemptively introducing impeachment evidence). We agree with the district court that this decision was “hard *485 ly an unreasonable tactic” and that the state MAR court’s dismissal of this claim on the merits was therefore a reasonable application of Strickland.
V
In addition to his ineffective-assistance-of-counsel claims, Bacon contends that his sentencing hearing was infected by racial bias, depriving him of a fair trial and due process of law. In support of this contention, Bacon relies on an affidavit submitted by his attorney, who interviewed six jurors from Bacon’s 1991 sentencing hearing and an alternate juror from Bacon’s 1987 trial. Two jurors told Bacon’s attorney that during sentencing deliberations reference was made to Bacon’s race and to his involvement in an interracial relationship with Bonnie Sue Clark. Bacon is an African American, and Bonnie Sue Clark and Glen-nie Clark are white. The alternate juror told Bacon’s attorney that she recalled jurors making racial jokes during the course of the trial.
The state MAR court considered and rejected this claim of error without an evidentiary hearing, concluding that the evidence forecast in the affidavit concerning alleged statements and jokes made by jurors in deliberations would be inadmissible under N.C. Gen.Stat. § 15A-1240. The district court also rejected this claim in Bacon’s petition for habeas relief,.finding that the “allegations .in counsel’s affidavit are not sufficient to warrant an eviden-tiary hearing or granting of the writ.” The Federal Rules of Evidence, like the North Carolina statute, prohibit impeachment of a jury verdict by reference to conversations taking place during jury deliberations. See Fed.R.Evid. 606(b); see also Tanner v. United States, 483 U.S. 107, 121, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); Gosier v. Welborn, 176 F.3d 504, 610-11 (7th Cir.1999) (applying Fed.R.Evid. 606(b) to capital habeas proceedings).
Even if evidence of juror deliberations were admissible, we believe that the statements allegedly made would not indicate a “substantial and injurious effect or influence in determining the jury’s verdict.” Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The jury could appropriately have discussed Bacon’s race and that of his victim and accomplice because evidence at trial suggested that Bacon had killed Glennie Clark after he used a racial epithet during a heated discussion about Bacon’s relationship with Bonnie Sue Clark. Accordingly, the district court did not err in denying Bacon’s claim for habeas relief on this ground.
VI
Finally, Bacon contends that his rights under the Eighth and Fourteenth Amendments were violated because the trial court refused to instruct the jury that if Bacon were sentenced to life imprisonment, he would not be eligible for parole for 20 years. To rebut the State’s arguments concerning Bacon’s future dangerousness, Bacon’s counsel presented the testimony of several witnesses who testified that Bacon would be welcomed back into the community if he received a life sentence and was later released. Bacon then requested a clarifying instruction on parole eligibility, which the trial court refused to give.
On direct appeal, Bacon challenged the trial court’s ruling on federal constitutional grounds, relying on Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). The North Carolina Supreme Court rejected the challenge, distinguishing Simmons on the ground that Bacon would not have been ineligible for parole. See Bacon II, 446 S.E.2d at 558-59. The district court denied the claim for the same reason, concluding that the North Carolina Supreme Court had correctly held that Simmons was not controlling in this case. We *486 agree. “Simmons applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison.” Ramdass v. Angelone, — U.S. -, -, 120 S.Ct. 2113, 2121, 147 L.Ed.2d 125 (2000); see also id. at 2127 (O’Connor, J., concurring). Moreover, we have consistently refused to extend Simmons to situations where the defendant would be eligible for parole. See, e.g., Roach v. Angelone, 176 F.3d 210, 220 (4th Cir.1999); Keel v. French, 162 F.3d 263, 270 (4th Cir.1998); Fitzgerald v. Greene, 150 F.3d 357, 367 (4th Cir.1998). Because Bacon would not have been ineligible for parole under North Carolina law, he was not entitled to a Simmons instruction on parole eligibility, and the district court properly denied his petition for habeas relief on this claim.
VII
For the foregoing reasons, we reverse the district court’s grant of the writ of habeas corpus based on ineffective assistance of counsel and affirm its rulings rejecting Bacon’s other claims for habeas corpus relief.
AFFIRMED IN PART, REVERSED IN PART

. Bonnie Sue was convicted of the same charges and sentenced to life imprisonment. See Clark, 377 S.E.2d at 57.

. Section 15A-2000 provides in pertinent part:
(f) Mitigating Circumstances. — Mitigating circumstances which may be considered shall include, but not be limited to, the following:
H: ‡
(8) The defendant aided in the apprehension of another capital felon or testified truthfully on behalf of the prosecution in another prosecution of a felony.

. At the first sentencing, the jury considered evidence of Bacon’s adaptability to prison life and did not unanimously find that it had been proven to be a mitigating factor by a preponderance of the evidence. Counsel should not be second-guessed for deciding not to raise this subject before the resentencing jury.

. The statement by Bacon's counsel really did not tell the jury anything that was not already obvious to them. The jurors had been told during the course of the proceedings that four years earlier there had been a trial and that during it Bacon had been found guilty of murder. The jury also knew that Bacon had given testimony at a previous penalty phase hearing. Thus, the jurors would have known that the current proceeding was a second sentencing hearing and one that would have been unnecessary if the first sentence had been the life sentence Bacon was seeking. Given these facts, we substantially discount any harm to have been caused by defense counsel’s argument mentioning the previous sentencing.

. The Harper Book of Quotations, at 255 (Robert I. Fitzheniy ed., 3d ed. 1993) (Hubert Humphrey).