ZACHARY, Judge.
 

 *248
 
 The trial court ordered Defendant Aaron Lee Gordon to enroll in lifetime satellite-based monitoring following his eventual release from prison. Defendant appeals. Because the State cannot establish at this time that Defendant's submission to satellite-based monitoring will constitute a reasonable Fourth Amendment search in the future, upon Defendant's release from prison, we vacate the trial court's civil order mandating satellite-based monitoring.
 

 Background
 

 I. Satellite-Based Monitoring
 

 Our General Assembly has described the legislative purpose of sex-offender registration programs as follows:
 

 ... the General Assembly recognizes that law enforcement officers' efforts to protect communities, conduct investigations, and quickly apprehend offenders who commit sex offenses or certain offenses against minors are impaired by the lack of information available to law enforcement agencies about convicted offenders who live within the agency's jurisdiction. ...
 

 Therefore, it is the purpose of this Article to assist law enforcement agencies' efforts to protect communities by requiring persons who are convicted of sex offenses or of certain other offenses committed against minors to register with law enforcement agencies, to require the exchange of relevant information about those offenders among law enforcement agencies, and to authorize the access to necessary and relevant information about those offenders to others as provided in this Article.
 

 N.C. Gen. Stat. § 14-208.5
 
 (2017).
 

 In furtherance of these objectives, the General Assembly enacted "a sex offender monitoring program that uses a continuous satellite-based
 
 *249
 
 monitoring system ... designed to monitor" the locations of individuals who have been convicted of certain sex offenses.
 
 N.C. Gen. Stat. § 14-208.40
 
 (a) (2017). The present satellite-based monitoring program provides "[t]ime-correlated and continuous tracking of the geographic location of the subject using a global positioning system based on satellite and other location tracking technology."
 
 N.C. Gen. Stat. § 14-208.40
 
 (c)(1) (2017). The reporting frequency of a subject's location "may range from once a day (passive) to near real-time (active)."
 
 N.C. Gen. Stat. § 14-208.40
 
 (c)(2) (2017).
 

 After determining that an individual falls within one of the three categories of offenders to whom the program applies,
 
 see
 

 N.C. Gen. Stat. § 14-208.40
 
 (a)(1)-(3), the trial
 
 *342
 
 court must conduct a hearing in order to determine the constitutionality of ordering the targeted individual to enroll in the satellite-based monitoring program.
 
 Grady v. North Carolina
 
 , 575 U.S. ----, ----,
 
 135 S.Ct. 1368
 
 ,
 
 191 L.Ed.2d 459
 
 , 462 (2015) ("
 
 Grady I
 
 ");
 
 State v. Blue
 
 ,
 
 246 N.C. App. 259
 
 ,
 
 783 S.E.2d 524
 
 , 527 (2016). The trial court may order a qualified individual to enroll in the satellite-based monitoring program during the initial sentencing phase pursuant to
 
 N.C. Gen. Stat. § 14-208
 
 .40A (2017), or at a later time during a "bring-back" hearing pursuant to § 14-208.40B (2017). For an individual ordered to enroll in the satellite-based monitoring program at the sentencing hearing, the monitoring begins after service of the individual's active sentence.
 

 II. Defendant's Enrollment
 

 In February 2017, Defendant pleaded guilty to statutory rape, second-degree rape, taking indecent liberties with a child, assault by strangulation, and first-degree kidnapping. Defendant was sentenced to 190 to 288 months' imprisonment and lifetime sex-offender registration. The trial court also ordered, pursuant to
 
 N.C. Gen. Stat. § 14-208.40
 
 (a)(1) and § 14-208.6(1a), that Defendant enroll in the satellite-based monitoring program for the remainder of his natural life upon his release from prison.
 

 The State's only witness at Defendant's satellite-based monitoring hearing was Donald Lambert, a probation and parole officer in the sex-offender unit. Lambert explained that the satellite-based monitoring device currently in use is "just basically like having a cell phone on your leg." The device requires two hours of charging each day, which must occur while the device remains attached to Defendant's leg. The charging cord is approximately eight to ten feet long. Defendant must also allow an officer to enter his home in order to inspect the device every 90 days.
 

 *250
 
 Lambert testified that under the current satellite-based monitoring program, the device is "monitoring where you're going at all times[.]" Once Defendant is released from prison, "we [will] monitor [him] weekly. ... [W]e just basically check the system to see his movement to see where he is, where he is going weekly. ... [W]e review all the particular places daily where he's been." "[T]he report that can be generated from that tracking[ ] gives that movement on a minute-by-minute position," as well as "the speed of movement at the time[.]" Under the current statutory regime, this information can be accessed at any time; no warrant is required. The monitoring system will also "immediately" alert the authorities if Defendant enters a restricted area, such as driving past a school zone. In the event that this were to happen, Lambert testified that "What we normally do is we contact [the enrollee] by phone immediately after they get the alert, ask where they are."
 

 Lambert was asked what Defendant would have to do if "he had a traveling sales job that covered, for instance, a regional area of Virginia, North Carolina and South Carolina?" Lambert explained that the sheriff's office "would have to approve it." Defendant would also "have to clear that with [the Raleigh office] as well. And then he would have to notify the state that he's going to if he was going to-and have to decide whether or not he'd have to stay on satellite-based monitoring in another state."
 

 The State introduced Defendant's Static-99 score at his satellite-based monitoring hearing. Lambert explained that Static-99 is "an assessment tool that they've been doing for years on male defendants over 18. It's just a way to assess whether or not they'll commit a crime again of this [sexual] sort." Lambert testified that defendants are assigned "points" based on
 

 whether or not they've committed a violent crime, whether or not there was an unrelated victim, whether or not there was-there's male victims. ... Other than just the sexual violence, was there another particular part of violence in the crime-in the index crime? Also, [it] does take their prior sentencing dates into factor too.
 

 Defendant received a "moderate/low" score on his Static-99, which Lambert explained meant there was "a moderate to low [risk] that he would ever commit a crime like this again." Defendant did not have any convictions for prior sex offenses, but he was given a point for having previous violent convictions.
 

 *343
 
 Based on Defendant's Static-99 assessment, Lambert agreed that "it's not likely he's going to do that [commit
 
 *251
 
 a sex offense] again[.]" Other than Defendant's Static-99 score, neither Lambert nor the State were able to offer "any evidence ... as to what the rate of recidivism is during-even during [a] five-year period[.]"
 

 The purpose of the satellite-based monitoring program is "to monitor subject offenders and correlate their movements to reported crime incidents."
 
 N.C. Gen. Stat. § 14-208.40
 
 (d) (2017). However, Lambert also noted that the satellite-based monitoring program could potentially be of benefit to Defendant. As Lambert explained, "if somebody takes charges out, it will show where they are. So it kind of-it can help them as well, showing that they've been to particular places. If somebody says he was over here doing this at a particular time, it will-it will show, hey, no, he was over here."
 

 After reviewing the evidence presented during the hearing, the trial court recited the following:
 

 Let the record reflect we've had this hearing, and the Court is going to find by the preponderance of the evidence that the factors that the State has set forth-his previous assaults, the Static-99 history, the fact that this occurred in an apartment with other children present as well and the relatively minor physical intrusion on the defendant to wear the device-it's small. It has to be charged two hours a day. But other than that, it can be used in water and other daily activities-so I am going to find ... that he should enroll in satellite-based monitoring for his natural life unless terminated.
 

 Defendant filed proper notice of appeal from the trial court's satellite-based monitoring order. On appeal, Defendant only challenges the constitutionality of the satellite-based monitoring order as applied to him. He argues that the trial court erred in ordering that he be subjected to lifetime satellite-based monitoring because "[t]he state failed to meet its burden of proving that imposing [satellite-based monitoring] on [Defendant] is reasonable under the Fourth Amendment." We agree.
 

 Standard of Review
 

 A trial court's determination that satellite-based monitoring is a reasonable search under the Fourth Amendment is reviewed
 
 de novo
 
 .
 
 State v. Martin
 
 ,
 
 223 N.C. App. 507
 
 , 508,
 
 735 S.E.2d 238
 
 , 238 (2012) (citing
 
 State v. Bare
 
 ,
 
 197 N.C. App. 461
 
 , 464,
 
 677 S.E.2d 518
 
 , 522 (2009),
 
 disc. review denied
 
 ,
 
 364 N.C. 436
 
 ,
 
 702 S.E.2d 492
 
 (2010) ). "Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes
 
 *252
 
 its own judgment for that of the lower tribunal."
 
 State v. Williams
 
 ,
 
 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008) (citations and quotation marks omitted).
 

 Discussion
 

 I.
 

 The Fourth Amendment provides:
 

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 

 U.S. Const. amend. IV. A "search" will be found to have occurred so as to trigger Fourth Amendment protections where the government "physically occupie[s] private property for the purpose of obtaining information[,]"
 
 United States v. Jones
 
 ,
 
 565 U.S. 400
 
 , 404,
 
 132 S.Ct. 945
 
 , 949,
 
 181 L.Ed.2d 911
 
 , 918 (2012), or where government officers are shown to have "violate[d] a person's 'reasonable expectation of privacy[.]' "
 

 Id.
 

 at 406
 
 ,
 
 132 S.Ct. at 950
 
 ,
 
 181 L.Ed.2d at 919
 
 (quoting
 
 Katz v. United States
 
 ,
 
 389 U.S. 347
 
 , 360,
 
 88 S.Ct. 507
 
 , 516,
 
 19 L.Ed.2d 576
 
 , 587 (1967) ) (other citations omitted).
 

 In
 
 Grady I
 
 , the United States Supreme Court held that enrollment of an individual in North Carolina's satellite-based monitoring program constitutes a search for purposes of the Fourth Amendment.
 
 Grady
 
 , 575 U.S. at ----,
 
 135 S.Ct. 1368
 
 ,
 
 191 L.Ed.2d at 461-62
 
 . In so concluding, the Supreme Court explained:
 

 *344
 
 In
 
 United States v. Jones
 
 , we held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.' " We stressed the importance of the fact that the Government had "physically occupied private property for the purpose of obtaining information." Under such circumstances, it was not necessary to inquire about the target's expectation of privacy in his vehicle's movements in order to determine if a Fourth Amendment search had occurred. "Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred."
 

 *253
 
 We reaffirmed this principle in
 
 Florida v. Jardines
 
 , [
 
 569 U.S. 1
 
 ,
 
 133 S.Ct. 1409
 
 ,
 
 185 L.Ed.2d 495
 
 ] (2013) [.] ... In light of these decisions, it follows that a State also conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements.
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1370
 
 ,
 
 191 L.Ed.2d at 461-62
 
 (quoting
 
 Jones
 
 ,
 
 565 U.S. at 404
 
 , 406 n.3,
 
 132 S.Ct. at 947, 949
 
 , 950 n.3,
 
 181 L.Ed.2d at 918
 
 , 919 n.3 ).
 

 Nevertheless, the Supreme Court in
 
 Grady I
 
 made clear that its determination that the defendant had been subjected to a search was only the first step in the overall Fourth Amendment inquiry, noting that "[t]he Fourth Amendment prohibits only
 
 unreasonable
 
 searches."
 

 Id.
 

 at ----,
 
 135 S.Ct. at 1371
 
 ,
 
 191 L.Ed.2d at 462
 
 . The Supreme Court explained that whether an individual's enrollment in the satellite-based monitoring program constitutes a reasonable Fourth Amendment search will "depend[ ] on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."
 

 Id.
 

 (citing
 
 Samson v. California
 
 ,
 
 547 U.S. 843
 
 ,
 
 126 S.Ct. 2193
 
 ,
 
 165 L.Ed.2d 250
 
 (2006) and
 
 Vernonia Sch. Dist. 47J v. Acton
 
 ,
 
 515 U.S. 646
 
 ,
 
 115 S.Ct. 2386
 
 ,
 
 132 L.Ed.2d 564
 
 (1995) ). However, as our courts had not yet conducted that inquiry, the Supreme Court declined to "do so in the first instance."
 
 Id
 
 . The Supreme Court concluded only that the satellite-based monitoring program constituted a search, leaving it to our courts to determine the "ultimate question of the program's constitutionality."
 

 Id.
 

 On remand from
 
 Grady I
 
 , this Court held that the defendant's enrollment in the satellite-based monitoring program was not a reasonable Fourth Amendment search.
 
 [1]
 

 State v. Grady
 
 , --- N.C. App. ----,
 
 817 S.E.2d 18
 
 , 2018 N.C. App. LEXIS 460 ("
 
 Grady II
 
 "). We noted that, notwithstanding the defendant's appreciably diminished expectation of privacy by virtue of his status as a convicted sex-offender, satellite-based monitoring was highly intrusive and unlike any other search the United States Supreme Court had upheld thus far. Despite the fact that satellite-based monitoring was "uniquely intrusive,"
 
 id.
 
 at *15, "the State failed to present any evidence of its need to monitor [the] defendant, or the procedures actually used to conduct such monitoring[.]"
 
 Id.
 
 at *21-22. Accordingly, we concluded that the State had failed to meet its burden of proving that satellite-based monitoring would constitute a reasonable
 
 *254
 
 Fourth Amendment search under the totality of the circumstances. This was particularly so in light of the fact that "law enforcement is not required to obtain a warrant in order to access [the] defendant's ... location data."
 
 Id.
 
 at *17. Indeed, it has long been "determined that 'where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant.' "
 
 Riley v. California
 
 , --- U.S. ----,
 
 134 S.Ct. 2473
 
 , 2482,
 
 189 L.Ed.2d 430
 
 , 439 (2014) (quoting
 
 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 653
 
 ,
 
 115 S.Ct. at 2390
 
 ,
 
 132 L.Ed.2d at
 
 574 ).
 

 II.
 

 In the instant case, pursuant to the satellite-based monitoring statutes, the State submitted an application for the general authority
 
 *345
 
 to collect and access Defendant's location information on a continuing basis. Defendant's location information would be accessed in order to determine whether Defendant has traveled to a restricted area and, more broadly, to "correlate [his] movements to reported crime incidents."
 
 N.C. Gen. Stat. § 14-208.40
 
 (c)(2), (d) (2017). This is in accordance with the underlying purpose of the satellite-based monitoring program, which is quite plainly "to discover evidence of criminal wrongdoing[.]"
 
 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 653
 
 ,
 
 115 S.Ct. at 2390
 
 ,
 
 132 L.Ed.2d at 574
 
 .
 

 The State filed its satellite-based monitoring application at the time of Defendant's sentencing, pursuant to
 
 N.C. Gen. Stat. § 14-208
 
 .40A. Because of Defendant's active sentence, the trial court's order granting the State's application will allow the State the authority to search Defendant-
 
 i.e.
 
 , to "physically occup[y] private property for the purpose of obtaining information"-beginning in 2032.
 
 [2]
 

 Jones
 
 ,
 
 565 U.S. at 404
 
 ,
 
 132 S.Ct. at 949
 
 ,
 
 181 L.Ed.2d at 918
 
 . Thus, in the instant case, Defendant has yet to be searched.
 

 Nevertheless, solely by virtue of his status as a convicted sex-offender, the trial court's order has vested in the State the authority to access the sum of Defendant's private life once he is released from prison.
 
 Grady II
 
 ,
 
 2018 LEXIS 460
 
 , at *15-16 (quoting
 
 Jones
 
 ,
 
 565 U.S. at 415
 
 ,
 
 132 S.Ct. at 955
 
 ,
 
 181 L.Ed.2d at 925
 
 (Sotomayor, J., concurring) ) (" 'GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about [his] familial, political, professional,
 
 *255
 
 religious, and sexual associations.' [T]hrough analysis of [satellite-based monitoring] location data, the State could ascertain whether an offender was regularly visiting a doctor's office, an ABC store, or a place of worship."). Lambert testified that pursuant to the satellite-based monitoring order, his office will "monitor [Defendant] weekly. ... [W]e just basically check the system to see his movement to see where he is, where he is going weekly. ... [W]e review all the particular places daily where he's been." Neither the State's application nor the trial court's order place limitations on the State's ability to access this information. The trial court's order resembles, in essence, a general warrant.
 

 A "general warrant" has traditionally been described as one "that gives a law-enforcement officer broad authority to search and seize unspecified places or persons; a ... warrant that lacks a sufficiently particularized description of the ... place to be searched."
 
 General Warrant
 
 , BLACK'S LAW DICTIONARY (8th ed. 2014). General warrants also include those that are not "supported by showings of probable cause that any particular crime ha[s] been committed."
 
 State v. Richards
 
 ,
 
 294 N.C. 474
 
 , 491-92,
 
 242 S.E.2d 844
 
 , 855 (1978) (citations omitted). In other words, general warrants are "not limited in scope and application."
 
 Maryland v. King
 
 ,
 
 569 U.S. 435
 
 , 466,
 
 133 S.Ct. 1958
 
 , 1980,
 
 186 L.Ed.2d 1
 
 , 32 (2013) (Scalia, J., dissenting). It is in the context of a warrant to search, however, that the State must make a proper showing of individualized suspicion and abide by "[t]he requirements of particularity of descriptions[,]" which are met only "when the warrant on its face leaves nothing to the discretion of the officer executing the warrant as to the premises to be searched and the activities or items which are the subjects of the proposed search."
 
 Brooks v. Taylor Tobacco Enters., Inc.
 
 ,
 
 298 N.C. 759
 
 , 762,
 
 260 S.E.2d 419
 
 , 422 (1979) (citation omitted);
 
 Richards
 
 ,
 
 294 N.C. at 491-92
 
 ,
 
 242 S.E.2d at 855
 
 . The requirements of individualized suspicion and particularity operate precisely to prevent the government's use of general warrants-as our Supreme Court has noted, general warrants have been "abhorred since colonial days and [are] banned by both the Federal and State Constitutions."
 
 Richards
 
 ,
 
 294 N.C. at 491
 
 ,
 
 242 S.E.2d at 855
 
 (citation and quotation marks omitted).
 

 The satellite-based monitoring program grants a similarly expansive authority to State officials. State officials have the ability to access the details of a monitored defendant's private life whenever they see fit. A
 
 *346
 
 defendant's trip to a therapist, a church, or a family barbecue are revealed in the same manner as an unauthorized trip to an elementary school. At no point are officials required to proffer a suspicion or exigency upon which their searches are based or to submit to judicial oversight. Rather,
 
 *256
 
 the extent of the State's ability to rummage through a defendant's private life are left largely to the searching official's discretion, constrained only by his or her will.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 State v. White
 
 ,
 
 322 N.C. 770
 
 , 774,
 
 370 S.E.2d 390
 
 , 393 (1988) (quoting
 
 Coolidge v. New Hampshire
 
 ,
 
 403 U.S. 443
 
 , 467,
 
 91 S.Ct. 2022
 
 , 2038,
 
 29 L.Ed.2d 564
 
 , 583 (1971) ) (" 'The second, distinct objective [of the warrant requirement] is that those searches deemed necessary should be as limited as possible. Here, the specific evil is the "general warrant" abhorred by the colonists, and the problem is not that of intrusion
 
 per se
 
 , but of a general, exploratory rummaging in a person's belongings.' "). Thus, it is all the more critical that the State meet the requirement of otherwise showing the
 
 reasonableness
 
 of the satellite-based monitoring search.
 

 This Court will not exhibit a more generous faith in our government's benign use of general warrants than did the Founders. In the Declaration of Rights of the North Carolina Constitution, the use of general warrants is explicitly condemned as "dangerous to liberty" and the Constitution mandates that general warrants "shall not be granted." N.C. Const. art. I, § 20. The Framers of the Fourth Amendment to the United States Constitution sought to prevent the use of general warrants as well.
 
 See
 

 Payton v. New York
 
 ,
 
 445 U.S. 573
 
 , 583,
 
 100 S.Ct. 1371
 
 , 1378,
 
 63 L.Ed.2d 639
 
 , 649 (1980) ("It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment.");
 
 see also
 
 Thomas Y. Davies,
 
 Recovering the Original Fourth Amendment
 
 , 98 MICH. L. REV. 547, 590 (1999) ("[The Framers] were concerned about a specific vulnerability in the protections provided by the common law; they were concerned that legislation might make general warrants legal in the future, and thus undermine the right of security in person and house. Thus, the framers adopted constitutional search and seizure provisions with the precise aim of ensuring the protection of person and house by prohibiting legislative approval of general warrants."). As pointed out in an unrelated case by Justice Newby of our Supreme Court, "the purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by governmental officials ... in order to safeguard the privacy and security of individuals against arbitrary invasions[.]"
 
 State v. Heien
 
 ,
 
 366 N.C. 271
 
 , 278-279,
 
 737 S.E.2d 351
 
 , 356 (2012) (citation and quotation marks omitted).
 

 Given the unlimited and unfettered discretion afforded to State officials with the satellite-based monitoring system, the State's burden of establishing that the use of satellite-based monitoring will comply with
 
 *257
 
 the Fourth Amendment's demand that all searches be "reasonable" is especially weighty.
 
 [3]
 

 *347
 

 III.
 

 In the case at bar, the State has failed to meet its burden of showing that the implementation of satellite-based monitoring of this Defendant will be reasonable notwithstanding the level of discretion afforded. That is, the State has not established the circumstances necessary for this Court to determine the reasonableness of a search fifteen to twenty years before its execution.
 
 [4]
 

 We note that because the stated purpose of the satellite-based monitoring program is to discover evidence of criminal wrongdoing, Defendant's enrollment in that program cannot be said to be reasonable in light of the "special needs" exception to the warrant requirement,
 
 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 652-53
 
 ,
 
 115 S.Ct. at 2390-2391
 
 ,
 
 132 L.Ed.2d at 574
 
 , nor does the State argue such to be the case. Rather, if Defendant's continuous location accessing can be constitutional absent proper prior
 
 *258
 
 judicial approval, it must be in light of its reasonableness pursuant to a general balancing approach.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Samson
 
 ,
 
 supra
 
 . That analysis ordinarily involves an examination of the circumstances existing at the time of the search, including "the nature of the privacy interest upon which the search ... intrudes"; "the character of the intrusion" itself and "the information it discloses"; as well as "the nature and immediacy of the governmental concern at issue ... and the efficacy of th[e] means for meeting it."
 
 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 654, 658, 660
 
 ,
 
 115 S.Ct. at 2391, 2393, 2394
 
 ,
 
 132 L.Ed.2d at 575, 577, 578, 579
 
 .
 

 This Court was able to determine the reasonableness of the trial court's satellite-based monitoring orders in
 
 Grady II
 
 and
 
 Griffin
 
 because the defendants had already become subject to the monitoring at the time of our analyses. In
 
 Grady II
 
 , the trial court ordered the defendant to enroll in satellite-based monitoring at a "bring-back" hearing pursuant to
 
 N.C. Gen. Stat. § 14-208
 
 .40B, "more than three years after" the defendant's release.
 
 Grady II
 
 ,
 
 2018 LEXIS 460
 
 , at *11. We could thus examine the totality of the circumstances in order to determine the reasonableness of subjecting the defendant to satellite-based monitoring. For example, we considered the characteristics of the monitoring device that was currently in use; the manner in which the defendant's location monitoring was conducted as well as the purpose for which that information was used under the current statute; and the State's interest in monitoring that particular defendant in light of his "current threat of reoffending[.]"
 
 Id.
 
 at *13, 17. Based on these circumstances, we concluded that "the State failed to prove, by a preponderance of the evidence, that lifetime [satellite-based monitoring] of [the] defendant is a reasonable search under the Fourth Amendment."
 
 Id.
 
 at *22. Similarly, in
 
 Griffin
 
 , the "[d]efendant was instructed to appear for a 'bring-back' hearing to determine whether he would be required to participate in [the satellite-based monitoring] program."
 
 Griffin
 
 , 2018 N.C. App. LEXIS 792, at *2. At the hearing, the trial court " 'weighed the Fourth Amendment right of the defendant to be free from unreasonable searches and seizures with the publics [sic] right to be protected from sex offenders and ... conclude[d] that the publics [sic] right of protection outweigh[ed] the "de minimis" intrusion upon the defendant's Fourth Amendment rights.' "
 
 Id.
 
 at *5. However, on appeal, this Court noted that "unless [satellite-based monitoring] is found to be effective to actually serve the purpose of protecting against recidivism by sex offenders, it is impossible for the State to justify the intrusion of continuously tracking an offender's location for
 
 *348
 
 any length of time, much less for thirty years."
 
 Id.
 
 at *11-12. We therefore concluded that "absent any evidence that satellite-based monitoring ... is effective to protect the public from sex offenders, the trial
 
 *259
 
 court erred in imposing [satellite-based monitoring] on [the defendant] for thirty years."
 
 Id.
 
 at *1.
 

 In the instant case, the State's ability to establish reasonableness is further hampered by the lack of knowledge concerning the future circumstances relevant to that analysis. For instance, we are not yet privy to "the invasion which the search [will] entail[ ]."
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , 21,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 , 905 (1968) (alteration omitted) (citation and quotation marks omitted). The State makes no attempt to report the level of intrusion as to the information revealed under the satellite-based monitoring program, nor has it established that the nature and extent of the monitoring that is currently administered, and upon which the present order is based, will remain unchanged by the time Defendant becomes subjected to the monitoring.
 
 Cf.
 

 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 658
 
 ,
 
 115 S.Ct. at 2393
 
 ,
 
 132 L.Ed.2d at 578
 
 ("[I]t is significant that the tests at issue here look only for drugs, and not for whether the student is, for example, epileptic, pregnant, or diabetic. ... And finally, the results of the tests ... are not turned over to law enforcement authorities or used for any internal disciplinary function.") (citations omitted). Instead, the State's argument focuses primarily on the "limited impact" of the monitoring device itself. The State, however, provides no indication that the monitoring device currently in use will be similar to that which may be used some fifteen to twenty years in the future.
 
 See
 

 State v. Spinks
 
 , --- N.C. App. ----, ----,
 
 808 S.E.2d 350
 
 , 361 (2017) (Stroud, J., concurring) (citing
 
 Riley
 
 , --- U.S. ----,
 
 134 S.Ct. 2473
 
 ,
 
 189 L.Ed.2d at
 
 446-47 ) ("The United States Supreme Court has recognized in recent cases the need to consider how modern technology works as part of analysis of the reasonableness of searches."). Nor does the record before this Court reveal whether Defendant will be on supervised or unsupervised release at the time his monitoring is set to begin, affecting Defendant's privacy expectations in the wealth of information currently exposed.
 
 Samson
 
 ,
 
 547 U.S. at 850-52
 
 ,
 
 126 S.Ct. at 2198-2199
 
 ,
 
 165 L.Ed.2d at
 
 258-59 ;
 
 Grady II
 
 ,
 
 2018 LEXIS 460
 
 , at * 11 ("Defendant is an unsupervised offender. He is not on probation or supervised release[.] ... Solely by virtue of his legal status, then, it would seem that defendant has a greater expectation of privacy than a supervised offender.");
 
 see also
 

 Vernonia Sch. Dist. 47J
 
 ,
 
 515 U.S. at 654
 
 ,
 
 115 S.Ct. at 2391
 
 ,
 
 132 L.Ed.2d at 575
 
 ("[T]he legitimacy of certain privacy expectations vis-à-vis the State may depend upon the individual's legal relationship with the State.").
 

 The State has also been unable at this point to adequately establish-on the other side of the reasonableness balance-the government's "need to search[.]"
 
 Terry
 
 ,
 
 392 U.S. at 21
 
 , 88 S.Ct. at 1879,
 
 20 L.Ed.2d at 905
 
 (citation and quotation marks omitted). The State asserts only that "[i]f, as Defendant
 
 *260
 
 acknowledges, the State has 'a substantial interest in preventing sexual assaults,' then the State's evidence amply demonstrated that Defendant warranted such concern in the future despite his STATIC-99 risk assessment score." However, the State makes no attempt to distinguish this interest from " 'the normal need for law enforcement[.]' "
 
 State v. Elder
 
 ,
 
 368 N.C. 70
 
 , 74,
 
 773 S.E.2d 51
 
 , 54 (2015) (quoting
 
 Griffin v. Wisconsin
 
 ,
 
 483 U.S. 868
 
 , 873,
 
 107 S.Ct. 3164
 
 , 3168,
 
 97 L.Ed.2d 709
 
 , 717 (1987) );
 
 see also
 

 King
 
 , 569 U.S. at 481, 133 S.Ct. at 1989,
 
 186 L.Ed.2d at 41
 
 (Scalia, J., dissenting) ("Solving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches.
 
 The Fourth Amendment must prevail.
 
 ") (emphasis added). In addition, to the extent that the current satellite-based monitoring program is justified by the State's purpose of deterring future sexual assaults, the State's evidence falls short of demonstrating what Defendant's threat of recidivating will be after having been incarcerated for roughly fifteen years.
 
 [5]
 

 E.g.,
 

 *349
 

 Brown v. Peyton
 
 ,
 
 437 F.2d 1228
 
 , 1230 (4th Cir. 1971) ("One of the principal purposes of incarceration is rehabilitation[.]"). The only individualized measure of Defendant's threat of reoffending was the Static-99, which the State's witness characterized as indicating that Defendant was "not likely" to recidivate. Lambert, the State's only witness, was asked "what, if any, information do you have that would forecast-besides the Static-99, which would seem to indicate [Defendant] has no real likelihood of recidivism here, do you have any other evidence that would indicate the reason that the State of North Carolina would need to search his location or whereabouts on a regular basis?" Lambert responded, "I don't have any information on that[.]"
 

 Without reference to the relevant circumstances that must be considered, the State has not met its burden of establishing that it would otherwise be reasonable to grant authorities unlimited discretion in searching-or "obtaining"-Defendant's location information upon his release from prison.
 
 Jones
 
 ,
 
 565 U.S. at 404
 
 ,
 
 132 S.Ct. at 949
 
 ,
 
 181 L.Ed.2d at 918
 
 . Authorizing the State to conduct a search of this magnitude fifteen to twenty years in the future based solely upon scant references to present circumstances would defeat the Fourth Amendment's requirement of circumstantial reasonableness altogether.
 

 *261
 
 Nevertheless, our concurring colleague urges that our holding today "imposes a burden on the State to predict the future." This is not the case. It is the Fourth Amendment that imposes a burden on the State to establish the reasonableness of its searches, and an individualized determination of reasonableness in time, place, and manner is a routine duty of judges. Our General Assembly in the instant case has tasked the State, pursuant to
 
 N.C. Gen. Stat. § 14-208
 
 .40A, with meeting that burden decades in the future. As "an error-correcting body, not a policy-making or law-making one[,]"
 
 Fagundes v. Ammons Dev. Grp., Inc.
 
 , --- N.C. App. ----, ----,
 
 796 S.E.2d 529
 
 , 533 (2017) (citation and quotation marks omitted), we are constrained to follow precedent and statutes as written, and not as we might wish them to be. Moreover, we do not hold that it is not possible for the State to meet this challenge. Rather, our holding is simply that, in the case at bar, the State has failed to do so.
 

 Conclusion
 

 It may be that the trial court's order would be reasonable in the year 2032. The State, however, has failed to establish that to be the case. Accordingly, we necessarily conclude that the trial court's order enrolling Defendant in the satellite-based monitoring program upon his eventual release from prison is unconstitutional as applied to him. We therefore vacate the trial court's order. Because the instant case is the first in which this Court has addressed the merits of the reasonableness of an order entered pursuant to
 
 N.C. Gen. Stat. § 14-208
 
 .40A, we remand with instructions for the trial court to dismiss the State's application for satellite-based monitoring without prejudice to the State's ability to reapply.
 
 Cf.
 

 State v. Greene
 
 , --- N.C. App. ----,
 
 806 S.E.2d 343
 
 (2017).
 

 VACATED AND REMANDED.
 

 Judge HUNTER, JR. concurs.
 

 Judge DIETZ concurring in the judgment by separate opinion.
 

 DIETZ, Judge, concurring in the judgment.
 

 I agree with the majority that this case is controlled by our recent decisions in
 
 State v. Griffin
 
 , --- N.C. App. ----,
 
 818 S.E.2d 336
 
 , 2018 N.C. App. LEXIS 792 (2018), and
 
 State v. Grady
 
 , --- N.C. App. ----,
 
 817 S.E.2d 18
 
 , 2018 N.C. App. LEXIS 460 (2018) (
 
 Grady II
 
 ). Under this precedent, the State failed to meet its burden to justify satellite-based monitoring in this case.
 

 *262
 
 I cannot join the majority's decision to expand the reasoning of
 
 Griffin
 
 and
 
 Grady II
 
 to require the State to address future, speculative facts that do not exist today. That portion of the majority's holding renders our State's satellite-based monitoring program unconstitutional in virtually every future
 
 *350
 
 case. This is so because the statute requires the State to conduct the initial satellite-based monitoring hearing at the time of criminal sentencing.
 
 N.C. Gen. Stat. § 14-208
 
 .40A.
 

 Satellite-based monitoring is imposed on offenders who commit heinous crimes such as child sex offenses and sexually violent offenses.
 
 N.C. Gen. Stat. §§ 14-208.40
 
 , 14-208.6(4). These are not offenders who expect to be sentenced to time served or immediately released on probation. Thus, in the vast majority of satellite-based monitoring cases, the offender will first serve time in prison before being released and subjected to monitoring.
 

 I disagree with the majority's view that the State must divine all the possible future events that might occur over the ten or twenty years that the offender sits in prison and then prove that satellite-based monitoring will be reasonable in every one of those alternate future realities. That is an impossible burden and one that the State will never satisfy.
 

 Those convicted of crimes, "especially very serious crimes such as sexual offenses against minors, and especially very serious crimes that have high rates of recidivism such as sex crimes, have a diminished
 
 reasonable
 
 constitutionally protected expectation of privacy."
 
 Belleau v. Wall
 
 ,
 
 811 F.3d 929
 
 , 936 (7th Cir. 2016). In my view, if the State can show, based on the facts that exist today, that a convicted sex offender is so dangerous to society that satellite-based monitoring will be necessary to protect the public upon that offender's release, then imposition of monitoring-even if it will not occur until some future time-can withstand constitutional scrutiny. After all, if facts change in the ways the majority speculates-the offender becomes disabled; technology radically changes; society becomes less tolerant of government monitoring of convicted sex offenders-the defendant can assert a
 
 Grady
 
 challenge at that time and the State will bear the burden of showing reasonableness based on those new facts.
 

 The majority instead imposes a burden on the State to predict the future. The Fourth Amendment does not require that level of clairvoyance. I believe society is prepared to accept as reasonable the imposition of future satellite-based monitoring on dangerous convicted sex offenders when the State has shown, based on the facts known today, that those offenders likely will pose a threat to society upon their release-particularly when those offenders can challenge the reasonableness of that monitoring if the facts change.
 

 [1]
 

 This Court reached a similar conclusion more recently in
 
 State v. Griffin
 
 , --- N.C. App. ----, --- S.E.2d ----, 2018 N.C. App. LEXIS 792.
 

 [2]
 

 The trial court sentenced Defendant to 190 to 288 months' imprisonment. Defendant was given credit for 426 days spent in confinement prior to the date judgment was entered against him in February 2017.
 

 [3]
 

 "The[ ] words [of the Fourth Amendment] are precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure ...' from intrusion ... by officers acting under the unbridled authority of a general warrant. Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. "Then and there," said John Adams, "then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born." ' "
 
 Stanford v. Texas
 
 ,
 
 379 U.S. 476
 
 , 481-82,
 
 85 S.Ct. 506
 
 , 509-510,
 
 13 L.Ed.2d 431
 
 , 435 (1965) (quoting
 
 Boyd v. United States
 
 ,
 
 116 U.S. 616
 
 , 625,
 
 6 S.Ct. 524
 
 ,
 
 29 L.Ed. 746
 
 , 749 (1886) ).
 

 [4]
 

 The merits of this issue have not yet come before this Court. To date, we have only assessed the reasonableness of a satellite-based monitoring order at the time the defendant had already been subjected to monitoring.
 
 Grady II
 
 , 2018 N.C. App. LEXIS 460;
 
 Griffin
 
 , 2018 N.C. App. LEXIS 792. This case presents the Court's first analysis of the constitutionality of an order enrolling a defendant in the satellite-based monitoring program several years prior to the time at which that monitoring is expected to begin.
 
 E.g.
 
 ,
 
 State v. Greene
 
 , --- N.C. App. ----,
 
 806 S.E.2d 343
 
 (2017) (unnecessary to address the constitutionality of the trial court's satellite-based monitoring order because the State conceded that the evidence presented was insufficient to establish that the search was reasonable);
 
 State v. Johnson
 
 , --- N.C. App. ----,
 
 801 S.E.2d 123
 
 (2017) (remanding the satellite-based monitoring order because the trial court did not conduct the appropriate reasonableness inquiry below).
 

 [5]
 

 We are cognizant of the fact that Defendant's Static-99 score was based in part upon his age at the likely time of release. However, this factor takes into account only Defendant's age, and not how long he will be incarcerated or his potential for rehabilitation while incarcerated.